```
1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------------------------------X
     TERREL HASKINS,
3
                                           PLAINTIFF,
4
5         -against-                    Case No.:
                                       15-CV-2016
6                                      (MLB)(RML)
7
     CITY OF NEW YORK, Captain THEODORE LAUTERBORN, Sgt.
8    CLIFFORD STRONG, Shield No. 4309, Detective ESSENCE
     JACKSON, Shield No. 2268, Detective HUMBERTO KIBEL,
9    Shield No. 2547, Detective CHRISTOPHER OTTOMANELLI,
     Shield No. 4621, and JOHN and JANE DOES 1 through 10,
10   individually and in their official capacities
     (the names John and Jane Doe being fictitious, as
11   the true names are presently unknown),
12                                         DEFENDANTS.
     ------------------------------------------------------X
13 .
14                         DATE:  February 17, 2016
15                         TIME:  11:45 A.M.
16
17
18              DEPOSITION of the Plaintiff, TERREL
19   HASKINS, taken by the Defendants, pursuant to a Notice
20   and to the Federal Rules of Civil Procedure, held at the
21   New York City Law Department, 100 Church Street, New York,
22   New York 10007, before Kelli Passalacqua, a Notary Public
23   of the State of New York.
24
25
```

```
 1    A P P E A R A N C E S:

 2

 3    ROBERT MARINELLI, P.C.
           Attorney for the Plaintiff
 4         TERREL HASKINS
           305 Broadway, 9th Floor
 5         New York, New York 10007
           BY:   ROBERT MARINELLI, ESQ.

 6

 7
      ZACHARY W. CARTER, ESQ.
 8    CORPORATION COUNSEL
      NEW YORK CITY LAW DEPARTMENT
 9         Attorneys for the Defendants
           CITY OF NEW YORK, Captain THEODORE LAUTERBORN,
10         Sgt. CLIFFORD STRONG, Shield No. 4309, Detective
           ESSENCE JACKSON, Shield No. 2268, Detective
11         HUMBERTO KIBEL, Shield No. 2547, Detective
           CHRISTOPHER OTTOMANELLI, Shield No. 4621, and
12         JOHN and JANE DOES 1 through 10, individually
           and in their official capacities (the names John
13         and Jane Doe being fictitious, as the true names
           are presently unknown)
14         100 Church Street
           New York, New York 10007
15         BY:   JOANNE MCLAREN, ESQ.
           File #:  2015-022279
16         Control #:  160519

17

18

19              *          *          *

20

21

22

23

24

25
```

```
 1              F E D E R A L   S T I P U L A T I O N S

 2

 3

 4              IT IS HEREBY STIPULATED AND AGREED by and between

 5    the counsel for the respective parties herein that the

 6    sealing, filing and certification of the within deposition

 7    be waived; that the original of the deposition may be

 8    signed and sworn to by the witness before anyone authorized

 9    to administer an oath, with the same effect as if signed

10    before a Judge of the Court; that an unsigned copy of the

11    deposition may be used with the same force and effect as if

12    signed by the witness, 30 days after service of the

13    original & 1 copy of same upon counsel for the witness.

14

15              IT IS FURTHER STIPULATED AND AGREED that all

16    objections except as to form, are reserved to the time of

17    trial.

18

19                    *       *       *       *

20

21

22

23

24

25
```

T. HASKINS

1    Haskins?

2        A.     Six feet, two hundred thirty-seven.

3        Q.     Your height is six feet and your weight is two

4    hundred thirty-seven?

5        A.     Yes.

6        Q.     It is fair to say that on February 14, 2015, the

7    date of the arrest, your height was the same?

8        A.     Yes.

9        Q.     How about your weight?

10       A.     I don't know, around the same.

11       Q.     That would be around 237, something like that?

12       A.     Yeah.

13       Q.     What age were you on February 14, 2015?

14       A.     Thirty-one.

15       Q.     Are you right-handed or left-handed?

16       A.     Right.

17       Q.     Are you married?

18       A.     No.

19       Q.     Have you ever been married?

20       A.     No.

21       Q.     Do you have any children?

22       A.     No.

23       Q.     Do you have any siblings?

24       A.     Yes.

25       Q.     How many siblings do you have?

T. HASKINS

```
 1   night.
 2        Q.    How do you know Dale Anderson?
 3        A.    He was my friend's mom's boyfriend.
 4        Q.    What was the name of your friend's mom?
 5        A.    Carolyn Copeland.
 6        Q.    C-O-P-E-L-A-N-D?
 7        A.    Yes.
 8        Q.    Can you spell Carolyn?
 9        A.    C-A-R-O-L-Y-N.
10        Q.    Is Dale Anderson still Carolyn Copeland's
11   boyfriend?
12        A.    I don't know.
13        Q.    What is the name of your friend?
14        A.    Malik, all of them my friends living there at
15   that time.  She had a son who doesn't live there.  He
16   didn't live there at the time, Steven.  Another son
17   Charles, Jason and a daughter a named, Shauntasia.  I was
18   friends with all of them.
19        Q.    Can you repeat those names of the people who were
20   the children of Carolyn Copeland?
21        A.    Malik, Steven, Jason, Charles, Shauntasia.
22        Q.    Can you spell Shauntasia, please?
23        A.    S-H-A-U-N-T-A-S-I-A.
24        Q.    Any other children who were the children of
25   Carolyn Copeland?
```

T. HASKINS

| | | |
|---|---|---|
| 1 | A. | The twins was like adopted from her ex-husband |

2  who had passed away, that was Juanita and Kristina.

3      Q.    Can you spell that?

4      A.    Kristina with a K.

5      Q.    Any other children of Carolyn Copeland?

6      A.    That I know?

7      Q.    Yes.

8      A.    Yeah, she has a daughter in Ohio, Katrina.

9      Q.    Any others?

10     A.    I don't know.

11     Q.    Are you friends with each of these children?

12     A.    Yeah.

13     Q.    What was their relationship with Dale Anderson?

14     A.    Like I guess friends.  He is they steppops (sic)

15 but they kind of already older when he came around so not

16 really so, you know, just different.

17     Q.    You said "steppops" what is the meaning of that?

18     A.    Stepfather but not really because they were

19 already pretty much grown and mature when they came into

20 his life.

21     Q.    What was Dale Anderson's relationship to you?

22     A.    Nothing.  Friends, I guess.

23     Q.    You would agree Dale Anderson was your friend?

24     A.    Yes.

25     Q.    When did Mr. Anderson first became your friend?

T. HASKINS

1      Q.      When was the first time you remember meeting Dale

2   Anderson?

3      A.      I don't remember meeting him.  That is what I'm

4   saying.  You are asking me something that is not in my

5   recollection.

6      Q.      How many times have you met him?

7      A.      Numerous times, thousands.

8      Q.      Can you describe his appearance, please?

9      A.      White skin, heavyset.

10     Q.      What is his personality like?

11     A.      Regular.

12     Q.      Can you give any more explanation than regular?

13     A.      I don't really have a description.  Like I said,

14   he is not my peer.

15     Q.      I accept that.  That was not the question.

16             Does Dale Anderson work?

17     A.      I don't know.

18     Q.      Have you ever seen evidence that he worked?

19     A.      I seen him work.  I worked with him before.

20     Q.      When did you work with him?

21     A.      I don't recall.  We used to work in a bargain

22   store.

23     Q.      When was that?

24     A.      I don't remember.  It was in the neighborhood.

25   It was a long time ago.

T. HASKINS

1 Q. Do you know the name of the bargain store?

2 A. Bargain Variety.

3 Q. What neighborhood was that in?

4 A. Coney Island.

5 Q. What did you do there?

6 A. Sat at the front door.

7 Q. What did you do there?

8 A. Sat in the front of the store taking bags,

9 checked their bags.  I guess it would be safe to say I know

10 Dale Anderson before I was 20 because I was doing that job

11 when I was like 18 or 17, something like that.

12 Q. Where does Dale Anderson live now?

13 A. I don't know.

14 Q. When was the last time you saw him?

15 A. Probably last year, a little while after he came

16 from jail.

17 Q. So you mean 2015?

18 A. Yes.

19 Q. Do you remember roughly what month?

20 A. Probably December.

21 Q. December of 2015?

22 A. Yes.

23 Q. How many times did you see Dale Anderson after he

24 returned home from jail?

25 A. I don't know, maybe four.

T. HASKINS

1    Q.    Where did you see him on those four occasions?

2    A.    I saw him walking in the street.

3    Q.    Any other places you saw Mr. Dale Anderson in

4    2015 to the present, other than walking in the street?

5    A.    No.  Maybe at the corner store.  I don't know.

6    Q.    Have you had conversations with Mr. Anderson

7    since he returned from prison?

8    A.    I had greetings with him, not conversations.

9    Q.    What was the substance of the greetings?

10    A.    Hey, how you doing?  Good to see you.  Stay out

11    of trouble type things.

12    Q.    When you say you've seen Mr. Anderson since he

13    returned from prison, is that from the sentence he received

14    due to the arrest on February 14, 2015?

15    A.    Yes.

16    Q.    You knew that Dale Anderson went to prison as a

17    result of that arrest?

18    A.    Yes.

19    Q.    Who currently lives at 2940 West 31st Street

20    Apartment 7G?

21    A.    Miss Copeland.

22    Q.    That is Carolyn Copeland?

23    A.    Yes.

24    Q.    Who else lives with Miss Copeland at Apartment

25    7G?

T. HASKINS

1    have nowhere to go.

2        Q.    February 2015, how long did you stay in Apartment

3    7G then?

4        A.    I got arrested the next morning.

5        Q.    Your third time in 7G in 2015 --

6        A.    Was probably to go see Malik, maybe the beginning

7    of the fall.

8        Q.    Can you give me an estimate on the month?

9        A.    September, October, something like that.

10       Q.    How long did you stay for in September or October

11   of 2015?

12       A.    Couple of hours.

13       Q.    How about the fourth time that you were at 7G?

14       A.    Recently, in December.

15       Q.    What were you there for?

16       A.    To check on Malik, to meet up with him to go do

17   something.

18       Q.    Did you speak to Dale Anderson at 7G at that

19   time?

20       A.    No.  I don't think he is allowed to go there.

21       Q.    Why do you think he is not allowed to go there?

22       A.    Because he got arrested.  I think you get banned

23   from housing.

24       Q.    In 2014, how many times would you say that you

25   were at Apartment 7G?

T. HASKINS

| 1 | A. | I don't know, maybe twice a week.  That is where |

1       A.      I don't know, maybe twice a week.  That is where

2   my friends are.

3       Q.      What was your purpose in going over to Apartment

4   7G in 2015?

5       A.      To visit my friends.

6       Q.      Were you visiting just Malik or other friends as

7   well?

8       A.      No, I visit Jason as well.

9       Q.      Any other friends in that apartment?

10      A.      Everybody coming through there.  We all friends.

11      Q.      What are the names of the other people?

12      A.      I gave you them already.

13      Q.      Do they all live in that apartment?

14      A.      No.

15      Q.      Which one of them lives in Apartment 7G?

16      A.      Malik, Jason and Chucky.

17              MR. MARINELLI:  Off the record.

18              (Whereupon, an off-the-record discussion was

19              held.)

20      Q.      Malik, Jason and Chucky live in 7G?

21      A.      Yes.

22      Q.      Anyone else?

23      A.      Charles' daughter.

24      Q.      What is Charles' daughter's name?

25      A.      Briana.

T. HASKINS

1    know.

2        Q.    Where was Kristina?

3        A.    On the couch in the living room.

4        Q.    Was there anybody else in the living room?

5        A.    Me and Dale.

6        Q.    How many couches were in the living room?

7        A.    Three.

8        Q.    Did you each have your own couch?

9        A.    Yes.

10       Q.    When you go into Apartment 7G, can you describe

11   the layout of the apartment for me?

12       A.    Hallway, front door.  From the door you can see

13   straight to the back of the house pretty much.  Two closets

14   here (indicating), living room, hallway, bedroom closet,

15   bedroom, bathroom, bathroom, bedroom, make a left, bedroom.

16       Q.    It's going to be impossible for the court

17   reporter to take down hand movements.  Can I ask you to

18   draw a rough outline?

19             MR. MARINELLI:  He is not going to draw an

20             outline.

21             MS. MCLAREN:  I would like to know the

22             layout.

23             MR. MARINELLI:  He can describe it.

24             MS. MCLAREN:  It would be easier if he could

25             draw a floor plan of it.

T. HASKINS

1              MR. MARINELLI:  There is a floor plan of it.
2              There is a floor plan of it in discovery.  If
3              not, we can get a floor plan.
4       Q.    How far away from the front door of the apartment
5    would you say the two bathrooms were?
6       A.    Estimation of feet, approximately the first
7    bathroom is probably like 22 feet from the front door,
8    probably further than that.  Let me think.  Maybe 22, 25
9    feet something like that.
10      Q.    How about the second bathroom?
11      A.    Probably 31 feet, 32 feet.
12      Q.    How far away from the living room where you were
13   staying would the first bathroom be?
14      A.    About from the ending of the living room to the
15   first bathroom?
16      Q.    Yes.
17      A.    Probably 12 feet, 13 feet, something like that.
18      Q.    How about the second bathroom, how far away was
19   that from the living room where you were staying?
20      A.    Another 7 feet.
21      Q.    So approximately 19 feet?
22      A.    Yes.
23      Q.    From February 13th to February 14, 2015, did you
24   go into either bathroom?
25      A.    No.

T. HASKINS

```
 1    Road?

 2        A.    Los.

 3        Q.    Can you spell that?

 4               MR. MARINELLI:  Carlos Rivera.

 5               THE WITNESS:  Yes.

 6        Q.    You are referring to Carlos Rivera as "Los"?

 7        A.    Yes.

 8        Q.    What time did you wake up on February 13, 2015?

 9        A.    I don't know.

10        Q.    Approximately?

11        A.    In the morning.  I don't know.

12        Q.    Were you supposed to work?

13        A.    I went to work.

14        Q.    What time did you work on --

15        A.    I got to work --

16        Q.    You need to wait until I finish my question.  We

17    cannot talk over each other.  What time did you get to work

18    on February 13, 2015?

19        A.    I got to work at 3:00, my normal shift.

20        Q.    Three p.m.?

21        A.    Three to eleven.

22        Q.    Where did you work that day?

23        A.    City Point.

24        Q.    Were you working as a fireguard that day?

25        A.    Yes.
```

T. HASKINS

1     Q.     After you finished your shift at work, what did

2  you do?

3     A.     I went to my girlfriend's mother's house.

4     Q.     Your girlfriend was Asia Johnson?

5     A.     Yes.

6     Q.     Where did she live on February 13, 2015?

7     A.     32nd between Neptune and Mermaid.

8     Q.     How far away was that from the location you were

9  arrested on February 14, 2015?

10     A.     Like a block and a half, two blocks.

11     Q.     Where did Asia Johnson live on February 13, 2015?

12     A.     Don't actually know.  She has a residence out of

13  state but she was at her mother's house when I went there.

14     Q.     So Asia Johnson was at 32nd and Neptune on that

15  day?

16     A.     Yes.

17     Q.     Had you stayed overnight with Asia Johnson before

18  the arrest?

19     A.     No.

20     Q.     You had never spent the night with her?

21     A.     Not over there, no.

22     Q.     At any location.  I'm not restricting my

23  question.  Had you ever spent the night with Asia Johnson

24  before the arrest?

25     A.     No.

T. HASKINS

1    Q.    Had you ever spent the night at Asia Johnson's

2    mother's house before?

3    A.    No.

4    Q.    Did you have any discussions with Asia Johnson

5    and/or her mother regarding you not having a place to stay

6    that night?

7    A.    That night, no, I didn't have any discussions.

8    Q.    What time did you leave Asia Johnson's mother's

9    house on February 13, 2015?

10   A.    Probably like 12:00, 12:15, 12:30 something like

11   that.  I got there probably like 11:45.

12   Q.    What did you say, if anything, about where you

13   were going when you left Asia Johnson's mother's house?

14   A.    I didn't.

15   Q.    Where were you planning to go after leaving Asia

16   Johnson's mother's house?

17   A.    To the Bronx.

18   Q.    To Carlos Rivera's house?

19   A.    Yes.

20   Q.    When did you change your intention and no longer

21   intend to go to Carlos Rivera's apartment?

22   A.    When I couldn't get the money to go.

23   Q.    How much money did you need to get to Carlos

24   Rivera's apartment?

25   A.    $5.

T. HASKINS

1    anyone else?

2        A.    I never called Miss Copeland for the money.

3        Q.    Once you realized you didn't have any money, did

4    you --

5        A.    No, I don't call anyone else.

6        Q.    Did you contemplate staying overnight at anyone

7    else's apartment other than Miss Copeland's?

8        A.    No.   I can't really stay at any other person

9    house at that time.   I probably could have but I didn't

10   contact anyone else to do it.

11       Q.    Why did you contact Miss Copeland as opposed to

12   your friend, Malik?

13       A.    They live in the same apartment.

14       Q.    Why did you call Miss Copeland?

15       A.    Because Malik was in Atlantic City.

16       Q.    Were any other of Miss Copeland's children in the

17   apartment when you called Miss Copeland to the best of your

18   knowledge?

19       A.    Yes.

20       Q.    What made you to decide not to call any of the

21   children of Miss Copeland?

22       A.    Because I know her number by heart.

23       Q.    Do you know Malik's number by heart?

24       A.    Yes.

25       Q.    But you knew he was in the Atlantic City?

T. HASKINS

1      A.      He was one of the people I called to borrow the

2      money.  He was like, "I'm not home."

3      Q.      How many times prior to February 2015 had you

4      stayed overnight in Apartment 7G?

5      A.      I don't know.

6      Q.      Your best estimate?

7      A.      He is my childhood friend.  I spent nights there

8      as a kid.  I spent plenty of nights there.

9      Q.      Let's take from 2010 to 2015, taking away when

10     you were a child, 2010 to 2015, how many times would you

11     say you stayed overnight at Apartment 7G, 2940 West 31st

12     Street?

13     A.      Probably say 100.

14     Q.      When you stayed there on those 100 approximate

15     occasions, where would you sleep?

16     A.      Usually in Malik's room.

17     Q.      On the night of February 13th, through February

18     14, 2015, who was sleeping in Malik's room?

19     A.      Juanita.

20     Q.      Anybody else?

21     A.      I'm not sure.  It might have been her and her

22     child but that is also a guess.  It is not a guarantee or

23     definite answer.  I didn't go in his room because he has a

24     lock on his door.

25     Q.      Was it locked on the night of February 13th into

69

T. HASKINS

1    February 14th?

2         A.    I don't know.  I didn't go in his room.  Like I

3    said, I knew he wasn't home.

4         Q.    Did any other bedrooms have locks on the door?

5         A.    I believe maybe one.

6         Q.    Did any of the bathrooms have locks from the

7    outside?

8         A.    No.

9         Q.    Were you allowed to use the bathroom if you

10   needed to?

11        A.    Sure.

12        Q.    Approximately what time do you believe that you

13   called Miss Copeland on February 13th, February 14, 2015?

14        A.    Like around the same time I got there, probably

15   between 12:30 and 1:00.

16        Q.    What did you say to Miss Copeland on the phone?

17        A.    "Hey, what's up?"  "What's up, baby?"  "I'm out

18   here, do you think I can spend the night at your house?"

19        Q.    What did she say?

20        A.    "Sure, no problem."

21        Q.    Anything else you remember about that

22   conversation?

23        A.    Maybe she said, anytime, I don't know.

24        Q.    Where were you in relation to the apartment

25   building when you made that call?

T. HASKINS

1      A.    In the hallway.

2      Q.    In the hallway of the building?

3      A.    In the hallway outside the door.

4      Q.    Did you actually get into the building --

5      A.    The building was open.

6      Q.    So you walked inside 2940 West 31st Street,

7    right?

8      A.    Yes.

9      Q.    Did you go in an elevator or take stairs; how did

10   you get to the apartment?

11     A.    Elevator.

12     Q.    You took the elevator to the seventh floor?

13     A.    Yes.

14     Q.    You called Miss Copeland from outside 7G?

15     A.    Yes.

16     Q.    How soon after that phone call was the door

17   opened?

18     A.    Within minutes.

19     Q.    It was Dale Anderson who opened the door?

20     A.    Yes.

21     Q.    You didn't see Miss Copeland that evening,

22   correct or did you?  Maybe I'm misremembering.

23     A.    I don't recall.  I don't think so.  At most I

24   might have said hello.  That is it but I don't think I went

25   to the back.

T. HASKINS

1    A.    Dale and Kristina.

2    Q.    Where were you sitting?

3    A.    When you come into the living room, you make a
4    left, there is a couch.  To the end by the window, there
5    was another couch and right side of the living room, there
6    was a couch.  I was at the couch closest to the window.

7    Q.    Was that sort of in the middle of the other two
8    couches?

9    A.    Not really in between them, no.  It is like how
10   this room is, that side, that side, back there, I would be
11   over there (indicating).

12   Q.    One couch was more --

13   A.    One couch was against the wall, one couch against
14   another wall and one couch against the window.

15   Q.    What would you say the dimensions of the room
16   were?

17   A.    I don't know.

18   Q.    Can you tell me with reference to the room in
19   which we currently are?

20   A.    The whole living room not including the part
21   that --

22   Q.    Including where the couches were, can you give me
23   a feet estimate?

24   A.    From the wall of the apartment to the window,
25   would be about 19 feet?

T. HASKINS

1    Q.    That would be the depth of the apartment; is that

2    right?

3    A.    (No response.)

4    Q.    Was the living room rectangular shape?

5    A.    Yes, I guess.

6    Q.    One of the legs of the rectangle were 19 feet.

7    Can you tell the other dimensions?

8    A.    The wall would be here, the front of the house

9    (indicating).  From this wall to that wall, where this

10   couch is on the right side of the living room and this

11   couch on the left side of the living room maybe 12 feet, 10

12   feet, something like that and from this wall from the T.V.

13   to the wall with the window is about 18 feet (indicating).

14   Q.    We can say the width is between 10 and 12 feet

15   and the other dimension was between 18 and 19 feet; is that

16   fair?

17   A.    Okay.

18   Q.    In that rectangular-shaped living room, there

19   were three couches?

20   A.    Yes.

21   Q.    One of them you were on?

22   A.    Yes.

23   Q.    Was Dale to your right or left?

24   A.    From my position facing -- if I was sitting on

25   the couches to my right.  If I was coming in the house,

T. HASKINS

1    Q.    When did you first meet Asia Johnson?

2    A.    PAL.

3              MR. MARINELLI:  When?

4              THE WITNESS:  Sometime when I was six or

5         eight something like that.

6    Q.    When did she become your girlfriend?

7    A.    The jury is still out.  I would say October,

8    November of 2014.

9    Q.    When did that relationship end?

10   A.    We are in litigation.  I know we broke up, I

11   guess, maybe June, but we still talking.

12   Q.    You broke up in June of 2015?

13   A.    Yes.

14   Q.    What did you mean by "We are in litigation"?

15   A.    We don't know if we want to work on it or

16   whatever.

17   Q.    You said you fell asleep early in the morning of

18   February 14, 2015.  What is the next thing you remember?

19   A.    A boom.

20   Q.    What was the boom?

21   A.    The police.

22   Q.    How many?

23   A.    Offhand, I'd say maybe four, five.

24   Q.    What time in the morning was that?

25   A.    It was like 5:00, 6:00, something like that.  It

T. HASKINS

1    was early.

2        Q.    Had you been planning to see Asia Johnson on

3    February 14, 2015?

4        A.    Definitely.

5        Q.    You were planning to go the Bronx first?

6        A.    I was planning to go to the Bronx that night.

7        Q.    When you went to sleep on the morning of February

8    14, 2015, what were your plans for the day that was about

9    to unfold?

10       A.    I don't know.  Probably get up go, get something

11   to eat.  Regular plans, regular day stuff until I was

12   supposed to meet up with her.

13       Q.    What time was that?

14       A.    We didn't have a schedule.  We both really

15   couldn't do much.  I had bought the earrings for her

16   daughter and she was working a part-time job so she didn't

17   have too much money.  She knew I was coming to spend time

18   with her.

19       Q.    Were you planning to go to her before you went to

20   Bronx?

21       A.    No, I saw her before I went to the Bronx.

22       Q.    On February 14, 2015, what were your plans for

23   that day?

24       A.    I didn't have plans.  I never got to make plans.

25   I was supposed to go to the Bronx the night before --

T. HASKINS

1    A.    I don't know, probably.

2    Q.    Did you get mail there in 2013?

3    A.    I don't have the answer to these questions.

4    Q.    To get a clear record in this lawsuit, I must ask

5    the questions and you must answer.  If you honestly don't

6    remember, you can tell me.

7    A.    I am and then you kept questioning me about it.

8          MR. MARINELLI:  Don't argue.  If you don't

9          remember, just say you don't remember.

10   Q.    Other than 790 McDonough Street, what other

11   addresses have you used to receive mail since 2010?

12   A.    I used 2940 West 31st Street.

13   Q.    What apartment?

14   A.    7G.

15   Q.    When did you use that apartment to receive mail?

16   A.    I don't know.  Through the years.  I used --

17   Q.    Through the years from 2010 to the present, you

18   have used 2940 West 31st Street, Apartment 7G?

19   A.    Yes, I also used 1916 Prospect Place.

20   Q.    Where is that?

21   A.    That is in East New York -- not East New York,

22   Crown Heights.

23   Q.    Was there an apartment there at 1916 Prospect

24   Place?

25   A.    Two.

T. HASKINS

1    apartment?

2        A.      No.

3        Q.      You said you woke up to a noise, a boom on the

4    morning of February 14th and that it was the police, right?

5        A.      Yes.

6        Q.      Tell me what happened right after you heard that

7    boom?

8        A.      Let's say I guess you hear the boom, startled.

9    They just grabbing stuff.  "Don't move.  Don't move.  Sit

10   on the couch.  Sit on the couch."

11       Q.      You were asleep at that time?

12       A.      Yes.

13       Q.      You woke up from the boom?

14       A.      Yes.

15       Q.      The police told you to sit up on the couch?

16       A.      They made everybody sit on the couch.

17       Q.      Who is everybody?

18       A.      They went through the house and gathered everyone

19   and made them sit on the couches.

20       Q.      Who was sitting, if anyone, on the same couch as

21   you?

22       A.      I think Dale.

23       Q.      They may have moved Dale from his couch to your

24   couch?

25       A.      The mother came out and she was kind of older and

T. HASKINS

1      A.      I guess they were searching the house.  They went

2    where I couldn't see.

3      Q.      Did they go into every bedroom?

4      A.      I can't see that.

5      Q.      Did they look in the living room?

6      A.      Yeah.

7      Q.      What did you think they were looking for?

8      A.      I don't know what they were looking for.

9      Q.      What was your reaction when the police came in

10   the house early in the morning?

11     A.      I half groggy, half shot.  I didn't see what

12   happened.  I was just sitting there like, okay.

13   Originally, I thought they came to the wrong place.

14     Q.      Did they say why they were there?

15     A.      Not initially.  They said they had a warrant, I

16   heard them say that.  Then while we were sitting there I

17   believe Mr. Anderson said, "Whatever you're all looking for

18   it is mine.  I got it.  I know where it is.  Nobody know

19   nothing."  More or less an admission of guilt.  He'll show

20   them where it's at, something like that.

21     Q.      When happened next?

22     A.      They grabbed him.  I'm not saying violently.

23   They came, took him to the back and they brought him back

24   to the front, I guess, he must gave them whatever they was

25   looking for.

T. HASKINS

1      A.      Yeah, I heard them say, "That's it.  That's

2    everything."

3      Q.      The officers were saying, "Where is the real

4    stuff?"

5      A.      And he said, "That is everything."

6      Q.      Mr. Anderson?

7      A.      Yes.

8      Q.      Do you know what the officers found?

9      A.      I know now.

10     Q.      What do you know now that they found?

11     A.      They found weed and cocaine.

12     Q.      Do you know how much cocaine they found?

13     A.      I don't know how much of either one that they

14   found.

15     Q.      Did you ever ask how much they found when you

16   were in Rikers?

17     A.      Not exactly.  At first I got arrested.  I asked

18   them, "What am I getting charged with?"  Nobody told me

19   anything until I got to the booking.  When I got to the

20   booking and they told me what my charges were, I was like

21   how?  Then I went to see the judge and I thought was going

22   to get released.  They didn't release me.  They gave me

23   bail and remanded me and I started making phone calls

24   because I was like yo, I can't be in jail.

25     Q.      Did you see the police remove any drugs or what

T. HASKINS

1    could arguably have been drugs from the apartment?

2         A.    I didn't see them remove anything.

3         Q.    Did you see the police with anything in their

4    hands?

5         A.    I didn't see.

6         Q.    Do you know where the drugs were found in the

7    house?

8         A.    In the closet.

9         Q.    Which closet?

10        A.    The closet by the bathroom.

11        Q.    That is the one that was across from the bedroom?

12        A.    Yes.

13        Q.    From the two bedrooms?

14        A.    Yes.

15        Q.    At what point in the proceedings were you and

16   Dale Anderson handcuffed?

17        A.    They started asking everybody for their name.  I

18   was in the living room, taking everybody name and then

19   after that they went to the back and then they arrested

20   him.

21        Q.    By arrested him, you mean?

22        A.    They put the handcuffs on him.

23        Q.    On Dale Anderson?

24        A.    Yes, and the same officer put handcuffs on me?

25        Q.    Do you know what the name of that officer was?

T. HASKINS

1    A.    No, he was tall, Spanish guy.

2    Q.    They put the handcuffs on both you and Mr.

3  Anderson and then what happened?

4    A.    They took us downstairs to the truck.  I asked

5  what I was arrested for.  The officer said, "I'm not the

6  one who making the arrest on you.  I'm just cuffing you and

7  taking you down."  So I didn't know what I was being

8  arrested for at that time.

9    Q.    Do you know why other adults in the apartment

10  were not also handcuffed?

11    A.    No.

12    Q.    Did the police ask you for any information other

13  than your name?

14    A.    No.

15    Q.    Did they ask you for your date of birth?

16    A.    Yeah, they ask you for your name and date of

17  birth I believe.

18    Q.    What date of birth did you give them?

19    A.    What you mean what date of birth?  My date of

20  birth, August 24, 1983.

21    Q.    Did you they ask for you an address?

22    A.    No.

23    Q.    Did they ask you for your Social Security Number?

24    A.    I don't think so.

25    Q.    Did they search you in any way?

T. HASKINS

1    A.    Yes.

2    Q.    How the did they search you?

3    A.    They patted me down, went in my pockets,

4  mandatory search I guess.

5    Q.    What were you wearing when the police first

6  entered the apartment?

7    A.    I don't know pants and shorts, hoodie, something

8  like that.

9    Q.    Where were your shoes?

10   A.    I think they was on.

11   Q.    You wore your shoes to bed?

12   A.    I didn't go to bed.  I spent the night at my

13  friend's house on the couch.

14   Q.    Did you fall asleep?

15   A.    Yes.

16   Q.    You fell asleep with your shoes on?

17   A.    Yes, I believe so because I don't recall putting

18  my shoes on to leave.

19   Q.    Did you do anything in terms of dressing before

20  you left with the police?

21   A.    No, no.  I don't think they give me anything to

22  put on.

23   Q.    Did you take anything out of your pockets or ask

24  to take anything out?

25   A.    No, I don't think I did.

T. HASKINS

1      Q.      Did you take your phone with you when you left

2    the apartment with the police?

3      A.      No, I think I left my phone there.

4      Q.      Whereabouts did you leave it?

5      A.      Probably on the couch.  I mean on the couch or

6    the table.

7      Q.      Why did you not take it with you?

8      A.      It wasn't in my pocket.

9      Q.      Why did you not lift it to take it with you?

10     A.      I'm getting arrested.  I could use phones in jail

11   now?

12     Q.      I'm asking you a question.

13     A.      It wasn't a thought on my mind.

14     Q.      Did you have any ID with you at the time of your

15   arrest?

16     A.      I believe I did.

17     Q.      What ID did you have with you?

18     A.      I think if I had a state ID.  It may or may not

19   have been expired.  I think state ID.

20     Q.      What address did that say on it?

21     A.      Probably 2975.

22     Q.      West 33rd Street?

23     A.      Yes.

24     Q.      From the living room where you had been sleeping,

25   was the closet where the drugs were found before or after

T. HASKINS

1    the bathroom?

2        A.    Before the bathroom.

3        Q.    To get to the bathroom you would pass the closet?

4        A.    Yes.

5        Q.    Do you admit what was found in the apartment was

6    cocaine and marijuana?

7        A.    No, I don't admit that.  I don't know.

8        Q.    Do you dispute that was cocaine and marijuana?

9        A.    No.

10       Q.    You don't know one way or the other?

11       A.    Correct.

12       Q.    When you were taken away from the building at

13   2940 West 31st Street on the morning of February 14, 2015,

14   where did you go?

15       A.    I believe truck or van.

16       Q.    Who was in the van with you?

17       A.    Dale Anderson.

18       Q.    Who else?

19       A.    That is it.

20       Q.    How many police were in the van with you?

21       A.    None.

22       Q.    Who was driving the van?

23       A.    Two officers drove the van but they didn't drive

24   immediately.  They took us down and sat us back there.  We

25   probably down there maybe for like an hour sitting in back

T. HASKINS

1    no, no.  Let me think.  I went to the shelter in the end of

2    2012.

3         Q.     Before that time in 2012, you have been with

4    Miss Copeland?

5         A.     Yes.

6         Q.     You stayed there for about two months for that

7    visit?

8         A.     More like three months.

9         Q.     Did you pay Miss Copeland for her allowing you to

10   stay in her apartment?

11        A.     No, I wasn't employed.

12        Q.     Were you getting any benefits at that time?

13        A.     Maybe food stamps or something, I don't know -- I

14   think I was trying to go to school right there.

15        Q.     What were you trying to go to the school for?

16        A.     ASA.

17        Q.     You did go to ASA at that time?

18        A.     Yes.

19        Q.     That was for how long?

20        A.     Three months.

21        Q.     You said you had mail delivered and you used 2940

22   West 31st Street, Apartment 7G as a mailing address.  What

23   kind of correspondence or mail had you received at that

24   address?

25        A.     I don't know.

T. HASKINS

1    Q.    Can you give us an example?

2    A.    School mail.

3    Q.    From ASA?

4    A.    I guess.

5    Q.    You tell me.

6    A.    I don't recall what I got.

7    Q.    You said school mail; what school would it be

8    other than ASA?

9    A.    I guess that is the school.  I'm just saying I

10   don't recall what mail I received there.  It's not like oh,

11   yeah, I get this mail to this address.  I just get mail.

12   Q.    Where does your cellphone bill go to?

13   A.    It texts my phone and I go to the store and pay

14   it.

15   Q.    Have you ever had a paper copy of cellphone bill?

16   A.    Yeah, when I had that -- I don't think I did but

17   I think that was in the Bronx.

18   Q.    How about tax forms, where did they get sent?

19   A.    Back the office that files them.

20   Q.    What do you mean by that?

21   A.    You talking about me filing taxes.

22   Q.    Any kind of tax document?

23   A.    Different places.

24   Q.    Have you ever received tax documents at 2940 West

25   31st Street Apartment 7G?

T. HASKINS

1      A.      Yes, but I don't recall going there and asking

2    them for mail in a while.

3      Q.      You know you have received a document at that

4    address?

5      A.      Yes, I have before.

6      Q.      Do you have liens or warrants or any

7    correspondences regarding nonpayment of taxes?

8      A.      I don't know.

9      Q.      Have you ever got into any trouble of any sort

10   regarding nonpayment of taxes?

11     A.      I don't believe so.  I have not been in trouble

12   yet.

13     Q.      Where does any correspondence regarding any

14   benefits you would get get mailed to?

15     A.      I don't get benefits.

16     Q.      In the past when you had benefits, where had

17   documents regarding these benefits been mailed to?

18     A.      Different addresses.

19     Q.      Can you give me some of those addresses?

20     A.      I would have to go ask them.

21     Q.      When is the last time you received any benefits?

22     A.      Probably 2012, 2011, something like that.

23     Q.      From 2013 to the present, how many cellphone

24   numbers have you had?

25     A.      Either two or three.

T. HASKINS

1    Q.    Who was the provider?

2    A.    Sprint.

3    Q.    How much did you pay per month for that phone?

4    A.    I don't recall.

5    Q.    Approximately?

6    A.    One hundred, one hundred change.

7    Q.    How long did you have that plan phone for?

8    A.    I don't know.

9    Q.    When was the last time you had that plan phone?

10   A.    I think I still have the phone somewhere.

11   Q.    When did you end the plan services?

12   A.    I guess 2013.

13   Q.    What made you stop using that plan phone?

14   A.    Too expensive.

15   Q.    You moved to another number?

16   A.    Yes.

17   Q.    That is the number you don't remember?

18   A.    Yes.

19   Q.    Who was the provider for that phone?

20   A.    I think Metro PCS.

21   Q.    How much did you pay per month for that?

22   A.    $50.

23   Q.    How long did you keep that for?

24   A.    Until I lost it.  I don't remember when that was.

25   Q.    What year?

T. HASKINS

1    A.    I guess 2014, would be my guess.

2    Q.    Then you got a new phone?

3    A.    Yes, this one.  I got a new number.

4    Q.    Why did you get a new number?

5    A.    I think it was cheaper to get a new number than

6    just buy a phone.  You know, they would have deals.

7    Q.    Any other reason why you changed your phone

8    number?

9    A.    No.

10   Q.    Who is the provider you used for your phone?

11   A.    Metro PCS.

12   Q.    What address did you give Metro CPS when you

13   registered for Metro PCS phone?

14   A.    I didn't give them one.

15   Q.    What information do they have on file for you?

16   A.    Nothing.

17   Q.    So to pay the bill --

18   A.    I go in.  They send you a text message to the

19   phone.

20   Q.    Did they give you any signing details?

21   A.    No.

22   Q.    You had an account with Sprint for some time,

23   correct?

24   A.    No, for a short amount of time.

25   Q.    Is it your understanding that Sprint PCS has 2940

T. HASKINS

1    West 31st Street, Apartment 7G, as the address for you on

2    file?

3        A.    I don't think so.

4        Q.    Would it surprise you to hear they have that

5    address on file for you?

6        A.    It wouldn't surprise me.

7              MS. MCLAREN:  Let's take a break, please.

8              (Whereupon a brief recess was taken.)

9        Q.    Do you know whose name is on the lease at 2940

10   West 31st Street?

11       A.    No.

12       Q.    Do you know if Miss Copeland's name is on the

13   lease?

14       A.    I guess so.  I believe she is head of household.

15       Q.    Do you know how long she has been head of

16   household?

17       A.    No.

18       Q.    Do you think it is more than five years?

19       A.    I would think since she lived there.

20       Q.    When do you think --

21       A.    I don't know.

22       Q.    Do you think it's been more than five years?

23       A.    Yes.

24       Q.    Do you think it's been more than ten years?

25       A.    Yes.

T. HASKINS

1    Q.    All that time has she been head of household?

2    A.    I believe so.

3    Q.    How long has Dale Anderson stayed at that

4    apartment, from when to when?

5    A.    I don't know.

6    Q.    When was the first time you noticed him in that

7    apartment?

8    A.    I don't know.

9    Q.    When was the first time you saw him at that

10   apartment?

11   A.    I don't know.

12   Q.    Was it before or after 2010?

13   A.    It was before 2010.

14   Q.    Had you seen him at that apartment on a regular

15   basis from 2010 until the time of your arrest?

16   A.    Pretty regularly.

17   Q.    Had you ever seen Dale Anderson with illegal

18   drugs?

19   A.    No.

20   Q.    Have you had any conversations with Dale Anderson

21   either before or after the February 14, 2015 arrest

22   regarding his involvement with illegal drugs?

23   A.    No.

24   Q.    Were you surprised at all that Dale Anderson was

25   involved in illegal drugs?

T. HASKINS

1     Q.     How far away, if you know, was Dale Anderson from

2     where the drugs were found?

3     A.     He was on the couch.

4     Q.     How far away was that from where the drugs were

5     found?

6     A.     Fifteen feet.

7     Q.     How far away were you from where the drugs were

8     found?

9     A.     Like 17 feet, maybe a little more.  I don't know.

10    Q.     Is there anything else other than the fact that

11    Dale Anderson admitted the drugs were his that you think

12    police overlooked in arresting you?

13              MR. MARINELLI:  Objection.  You can answer

14              but these are all legal questions.

15    Q.     I'm just trying to understand the basis of your

16    belief that the police shouldn't have arrested you?

17    A.     They didn't arrest anybody else.

18    Q.     Okay.

19    A.     I didn't do anything wrong.

20              (Continued on next page to include jurat.)

21

22

23

24

25

```
1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    --------------------------------------------X
     TERREL HASKINS,
3
                              PLAINTIFF,
4
                    -against-      Index No.:
5                                  15-CV-2016

6    CITY OF NEW YORK, CAPTAIN THEODORE
     LAUTERBORN, SGT. CLIFFORD STRONG, SHIELD NO.
7    4309, DETECTIVE ESSENCE JACKSON, SHIELD NO.
     2268, DETECTIVE HUMBERTO KIBEL, SHIELD NO.
8    2547, DETECTIVE CHRISTOPHER OTTOMANELLI,
     SHIELD NO. 4621, and JOHN AND JANE DOE 1
9    through 10, Individually and in their
     official capacities (the names John and Jane
10   Does being fictitious, as the true names
     Are presently unknown),
11
                              DEFENDANTS.
12   --------------------------------------------X

13                    DATE:   June 20, 2016

14                    TIME:   12:20 P.M.

15

16

17         CONTINUED EXAMINATION BEFORE TRIAL of the Plaintiff,

18   TERREL HASKINS, taken by the Defendants, pursuant to a

19   Court Order, held at the offices of the New York City Law

20   Department, 100 Church Street, New York, New York 10007,

21   before Rebecca Abramov, a Notary Public of the State of

22   New York.

23

24

25
```

```
 1    A P P E A R A N C E S:

 2

 3    ROBERT MARINELLI, P.C.
            Attorneys for the Plaintiff
 4          305 Broadway, 9th Floor
            New York, New York 10007
 5          BY:  JULIENE DREI MUNAR, ESQ.

 6

 7    ZACHARY W. CARTER, ESQ.
      CORPORATION COUNSEL
 8    NEW YORK CITY LAW DEPARTMENT
            Attorney for the Defendants
 9          100 Church Street
            New York, New York 10007
10          BY:  JOANNE M. McLAREN, ESQ.
            File #:  2015-022279
11          Claim #:  162061

12

13                  *         *         *

14

15

16

17

18

19

20

21

22

23

24

25
```

T.  HASKINS

1    or don't hear, please let me know and I'll be happy to

2    rephrase it or repeat it; is that fair enough?

3        A.      Yes.

4        Q.      And if you do answer the question, I'll assume

5    that you heard it, understood it, and have answered it to

6    the best of your ability.   Okay?

7        A.      Understood.

8        Q.      Okay.   Thank you.   Are you claiming that you lost

9    any income from your employment as a result of this arrest?

10       A.      I did.

11       Q.      How much income did you lose?

12       A.      Four days of work.

13       Q.      What four days of work did you miss?

14       A.      The fire guard.

15       Q.      And if you were arrested on February 14, 2015,

16   what days and dates of work did you miss?

17       A.      February 15th, February 16th, February 17th, and

18   February 18th.   And then when I went to court on Thursday,

19   so I think that was on the 19th.

20       Q.      Why did you miss work on the 15th to the 18th?

21       A.      I was in jail.

22       Q.      Did you get released from jail on the 18th or was

23   it before then?

24       A.      No, I got bailed out on the 18th and then I went

25   to court on the next day, I believe.

T. HASKINS

1    A.    Martin Allen.

2    Q.    When did your employer know that you were in

3    jail?

4    A.    I don't know when he was informed.

5    Q.    Did he know before February the 18th of 2015?

6    A.    I don't know.   That's the day he bailed me out.

7    I don't know if or when or how he got knowledge.

8    Q.    Prior to February the 14th of 2015, when was the

9    last time that you had taken any illegal drugs?

10   A.    Say that again.

11   Q.    Before the arrest at issue on February 14, 2015,

12   when was the last time that you had taken any illegal

13   drugs?

14        MS. MUNAR:   Objection.

15   A.    I don't even know what that means.

16   Q.    Thinking back to February 14, 2015, the date of

17   your arrest at issue here, when was the most recent time

18   before that arrest that you had taken marijuana or any

19   other drug?

20        MS. MUNAR:   Same objection.

21   Q.    You can answer.

22   A.    She objected.

23   Q.    Unless she directed you not to answer, you can

24   answer.

25   A.    I don't want to answer that.

T. HASKINS

```
1      Q.      You have to answer the question.

2      A.      Why?

3      Q.      Please answer the question.

4      A.      Of what relevance does this have?

5              MS. MUNAR:   You can answer, if you know.

6      A.      I don't know, but I still want to know why.

7      Q.      When was the most recent time before your

8  February 14, 2015 arrest, when you took illegal drugs?

9      A.      I don't know.

10     Q.      Did you take any illegal drugs, including

11  marijuana, in February of 2015?

12     A.      Probably.

13     Q.      Did you take any illegal drugs including

14  marijuana in the week before your arrest on February 14,

15  2015?

16     A.      I don't know.   I don't have a calendar of when I

17  smoke.

18     Q.      Is it possible that you took marijuana in the

19  week before your arrest on February 14, 2015?

20     A.      It could be possible.

21     Q.      At the first session of your deposition, do you

22  remember giving me a list of the people who were in the

23  apartment at the time of your arrest?

24     A.      I believe so.

25     Q.      And is it acceptable to you if, just as a
```

T. HASKINS

```
 1        A.      I guess within the first minute of them entering
 2   the apartment.
 3        Q.      So just after 6 o'clock in the morning?
 4        A.      Whatever time they entered.
 5        Q.      And where were the handcuffs taken off?
 6        A.      The handcuffs were taken off in the precinct, I
 7   believe.
 8        Q.      And roughly, what time of day were the handcuffs
 9   taken off?
10        A.      It was still morning, I believe.  But I don't
11   know, because we were sitting in the house for a while and
12   then they took us to the van downstairs which we sat in for
13   a while, I guess, for them to do whatever they have to do.
14   I don't know.
15        Q.      Do you claim that the officers in the apartment
16   physically hurt you in any way?
17        A.      No.
18        Q.      Are you claiming any physical injuries as a
19   result of this arrest?
20        A.      No.
21        Q.      Are you claiming that the police took any money
22   or possessions from you and did not return them?
23        A.      No.
24        Q.      Have you seen the arrest report in this case?
25        A.      No.  Can I see it?
```

T. HASKINS

1    He is here and I am over here.  If you walk in the distance

2    with the table and stuff, technically no.

3        Q.    How far away was Mr. Anderson from the closet

4    where the drugs were found?

5        A.    He is right here (indicating).

6        Q.    And the Court Reporter cannot take down what

7    you're pointing, so how far away was Mr. Anderson?

8        A.    If you give me a ruler and a key, I can tell you

9    definitively the answer.  I don't want to make an

10   assumption, because I don't know.  I don't have a ruler in

11   my head and I don't walk around with my measuring tape for

12   work.

13       Q.    I'm asking your best estimate.  I believe at your

14   last deposition you said that he was about 15 feet away

15   from the closet.

16       A.    Correct.  But I believe if I recall, because I

17   don't think that you were asking me that, you asked me

18   about where me and Dale were sitting on the couch.  Me and

19   Dale were sitting on the couch, we were both here

20   (indicating).

21       Q.    And by "here," what do you mean?

22       A.    On couch one.  And that's what I answered you in

23   reference to it.  But now you're asking me where he slept

24   at, which is couch two.

25       Q.    So on couch two on Defendants' Exhibit B, how far

T. HASKINS

1     away would you say that Mr. Anderson was from the closet?

2          A.    12 to 18 feet.

3          Q.    And how far away were you when you were asleep on

4     couch one from the closet in which the drugs were found?

5          A.    Probably around the same, as to a foot or two.

6          Q.    And by the "same," 12 to 18 feet?

7          A.    18 or like 14 to 20, you know, whatever the

8     proper trajectory would be.

9          Q.    Right.   I just want it to be clear because you

10    said "the same" and we don't know what "the same" refers

11    to.   So you meant give or take a few feet from couch number

12    one, which we've marked in Defendants' Exhibit B to the

13    closet in which the drugs were found?

14         A.    That may be one or two feet further from the

15    closet where he was, maybe.

16         Q.    And by "he," you mean Mr. Dale Anderson?

17         A.    Yes.

18         Q.    So if he were 12 to 18 feet, you would be --

19         A.    I would be 14 to 20.

20         Q.    I'm sorry, we need to get a clear record.

21         A.    I am saying it clearly, if he was 12 to 18, I

22    would assume that I was about 14 to 20.

23         Q.    Feet away from the closet, correct?

24         A.    Correct.

25         Q.    What was the first thing you heard before you

T. HASKINS

1             discovery and has not been produced.  So I would

2             again, call for production of the documents that

3             Mr. Haskins filled out in MDC.

4                 MS. MUNAR:  Okay.  If we have that, we will

5             produce it.

6                 MS. McLAREN:  Thank you.

7      Q.      Other than your lost wages, did you lose any

8  other income as a result of your arrest and detention?

9      A.      No.

10     Q.      Did you suffer any other economic loss as a

11  result of your arrest and detention?

12     A.      My phone bill was cut off.  That was it.  I paid

13  it late.  It was no big deal.

14     Q.      Why did your phone get cut off?

15     A.      Because I didn't have no money at that time.  It

16  was no big deal, regular thing.

17     Q.      How long was your phone cut off for?

18     A.      Like a week.

19     Q.      Are there any other economic damages which you

20  are seeking as a result of your arrest and detention?

21     A.      No.

22     Q.      Are you claiming that you suffered any

23  psychological injuries as a result of your arrest and

24  detention?

25     A.      No.

T.  HASKINS

1      A.      Looking for work.  Trying to move down there.

2      Q.      Why?

3      A.      Because I can.

4      Q.      Was there any reason why you decided to move to

5  Alabama?

6      A.      Because I can.

7      Q.      Was there any reason why you decided to move to

8  Alabama as opposed to any other place?

9      A.      Because I can.  America is a place of settlers,

10  it doesn't mean you settle in one place.

11      Q.      Do you remember being arrested in February of

12  2012 and charged with having an unleashed dog in a public

13  place?

14      A.      Yes, I didn't get arrested for that, I don't

15  think.

16      Q.      Where did that event take place?

17      A.      I don't recall.  It happened more than once.

18      Q.      Okay.  How many times do you remember having an

19  interaction of any description with police regarding your

20  having a dog unleashed in a public place?

21      A.      Maybe three.

22      Q.      Where did the first of these incidents take

23  place?

24      A.      I don't recall.

25      Q.      What borough?

T. HASKINS

1      A.      All three were in Brooklyn.  I believe all three

2   were in Coney Island.  I just don't recall in what order or

3   necessarily where.

4      Q.      Do you remember the dates of any of these

5   incidents?

6      A.      No, ma'am.

7      Q.      Do you remember the years in which any of

8   incidents took place?

9      A.      You just told me 2012.

10     Q.      You said three, were all three in 2012?

11     A.      Probably.

12     Q.      Was it the same dog on each of the three

13   occasions?

14     A.      Yes.

15     Q.      Whose dog were you with?

16     A.      I was with Ms. Copeland's dog.  But it wasn't

17   really her dog, it was a weird situation.

18     Q.      Explain to me, please.

19     A.      I don't really know the whole depths of it.

20     Q.      Was the dog staying in Ms. Copeland's apartment?

21     A.      For a little while, yes, it was.

22     Q.      And that was in 7G?

23     A.      Yes.

24     Q.      So if you were taking the dog outside, you were

25   taking it from 7G to outside and you were bringing the dog

T. HASKINS

1   back to 7G; is that right?

2       A.    Yes.

3       Q.    Why were you looking after or with Ms. Copeland's

4   dog on these occasions?

5       A.    Because I wanted to keep the dog.  I wanted to

6   take the dog.  I liked the dog.

7       Q.    What was the dog's name?

8       A.    Princess.

9       Q.    Were you staying with Ms. Copeland at the time?

10      A.    No, I don't think I was.  But I used to always go

11  over to see the dog.  I used to take the dog out often.  I

12  used to walk the dog with no leash, but the dog never bit

13  nobody, she never attacked nobody.  That was part of how I

14  was training her and that's how she respond.

15      Q.    So you were going over to Ms. Copeland's house

16  frequently to look after Princess?

17      A.    Yes, because I didn't think that she -- she

18  wasn't a bad dog, but I didn't think she was a good dog.

19  Like, she used to not listen.  But then I started, it's

20  like, you know how sometimes you have to give somebody

21  leeway so that they could learn, they didn't give her

22  leeway, but I did.

23      Q.    Understood.  How often then were you going to

24  Ms. Copeland's apartment?

25      A.    Probably every day.

T. HASKINS

1      Q.      In 2012?

2      A.      Not for the whole day, but probably for a lot of

3   it, yes.

4      Q.      A lot of 2012?

5      A.      Yes, or my off days probably.

6      Q.      Did you ever get to keep Princess?

7      A.      No, she is in whole other state, in Pennsylvania.

8   But she has a lot of space to play, so it's cool.

9              MS. McLAREN:   Mark this as C, please.

10             (Whereupon, the aforementioned arrest report

11             was marked as Defendants' Exhibit C for

12             identification as of this date by the Reporter.)

13     Q.      I'm going to show you what we've marked as

14   Defendants' Exhibit C.   Do you remember getting arrested in

15   November 2013 for walking through the doors of a train car?

16     A.      Yes, I got arrested for that, I'm not sure.   But

17   I remember, yes.   I think I could've gotten arrested.

18     Q.      What do you remember about that arrest?

19     A.      I'm trying to think.   I don't think I do remember

20   that.   February 29, 20- 13.

21     Q.      And the location is given as Surf Avenue and West

22   8th Street.   The station entered is given as Stillwell

23   Avenue.

24     A.      No, I don't remember.   I could've.   I remember --

25   I don't know.   I don't know exactly when it was, but I

T. HASKINS

1    remember getting harassed by going through the train car

2    door.  I think I was trying to go to work.

3         Q.    So is it fair to say that you remember an

4    incident where you were going through the doors of a train

5    car, but you don't remember the date exactly?

6         A.    I don't remember the date.  I don't know if I

7    really got arrested.  I remember they took me off the train

8    for a little while, but I don't remember.

9         Q.    I'm sorry, you remember that?

10        A.    They took me off of the train.

11        Q.    Who took you off of the train?

12        A.    The officer.  Not physically, he just asked me to

13   get off because they had to do paperwork and stuff, but I

14   don't know if I got arrested for that.  But I got a ticket.

15        Q.    And how many officers asked you to come off of

16   the train?

17        A.    I think it was one, but then while we were there,

18   I think a second one came.

19        Q.    Do you have any reason to believe that that

20   incident wasn't in November of 2013?

21        A.    No, I don't have any reason to argue for it or

22   against it.  I don't really recall.  I remember an accident

23   happened, but I don't really recall even the procedure or

24   anything.

25        Q.    If you look, please, on the first page of what

T. HASKINS

1   we've marked of Defendants' Exhibit C, you'll see your

2   name, "Defendant, "Terrel Haskins," and then some

3   identifying information.  It gives your date of birth as

4   August 24, 1983; that is your correct date of birth, right?

5       A.    Yes.

6       Q.    And on the second page, it lists your address at

7   2940 West 31st Street, is that the address that you gave to

8   the officers at the time?

9       A.    I'm not sure.  But why does this say "relation to

10  victim, stranger, living together, no, but could be

11  identified, yes, order of protection, no."  Although I have

12  never seen this before, this seems like a complaint, like I

13  did something to somebody.

14      Q.    You'll see the description of the events on the

15  front page and it's pertaining to walking through the doors

16  of the train car.  Some of this form may not be relevant to

17  you.  And I am looking at the second page and the address

18  which is given as 2940 West 31st Street.  And I would just

19  like to know whether that was the address that you would've

20  given to the police when they stopped you for walking

21  through the train car?

22      A.    Probably.

23      Q.    And did you have to report any arrest or

24  interactions that you had with the police to your employer,

25  PPEE?

T. HASKINS

1   that, to 60-30 days, somewhere between there.

2       Q.      So just to be clear, you were in Queensborough

3   then from around November of 2010 until January of 2011; is

4   that right?

5       A.      Correct.   Is that fairly accurate?

6       Q.      I'm asking you to the best of your recollection.

7       A.      I thought you had that information.

8       Q.      Do you have a City ID?

9       A.      No -- wait, what do you mean, because I got an ID

10  from the fire department.   That's when I got my fire guard,

11  so would that be considered a City ID or not?

12      Q.      What information is contained on your fire card

13  ID?

14      A.      Address.

15      Q.      What address is on it?

16      A.      2940 on that one, 790 on this one.   This is my

17  more recent one (indicating).

18      Q.      Could I see both of those IDs, please?

19      A.      Sure.

20      Q.      Thank you.

21      A.      (Handing.)

22      Q.      Did you have to take a test to get qualified as a

23  fire guard?

24      A.      Yes.

25      Q.      How often do you have to take that test?

T. HASKINS

1     A.     Every three years.  This one is going to expire

2  next year.

3     Q.     So I will make copies of these at the break.  But

4  just for the record, now you've handed me a card with your

5  photograph on it that says Certificate Issued by NYC Fire

6  Department.  It's got Cert. No. 88624234.  And this was

7  issued May 23, 2016 and it expires May 20, 2019; is that

8  right?

9     A.     Correct.

10     Q.     And it has your name as Terrel Haskins, and your

11  address at 790 McDonald Street, Brooklyn, New York, 11234,

12  correct?

13     A.     Correct.

14     Q.     It lists your employer as PPEE Construction,

15  Inc., correct?

16     A.     Yes.

17     Q.     And then you have also handed me another card

18  with your photograph.  Again, at the top of the card it

19  says "Certificate Issued by NYC Fire Department."  The

20  Cert. number is 87439436, correct?

21     A.     Yes.

22     Q.     And this card was issued on February 16, 2016 and

23  it expires on April 9, 2017, correct?

24     A.     Yes, it was a reissue.

25     Q.     When was the original card issued?

T. HASKINS

1    A.    4/9/2014.

2    Q.    4/9/2014?

3    A.    Yes, the original card.  This is a reissued card,

4   because I lost my thing and I can't work without it.

5    Q.    Although you had originally received it in April

6   of 2014, they issued you a new one in February of 2016; is

7   that right?

8    A.    No, they didn't issue me a new one.  I went down

9   there and I had to pay for it.

10    Q.    But you got a new card in February of 2016?

11    A.    Yes.

12    Q.    And instead of it being for a three-year term, it

13   was for the remainder of the initial three-year term?

14    A.    Correct.  I got the same card over.

15    Q.    And this card has your name as Terrel S. Haskins?

16    A.    Correct.

17    Q.    And your address as 2940 West 31st Street,

18   Apartment 7G, Brooklyn, New York 11224, correct?

19    A.    Correct.

20    Q.    And again, it lists your employer as PPEE

21   Construction, Inc., correct?

22    A.    Correct.

23                MS. MUNAR:  Is now a good time for a break?

24                MS. McLAREN:  Sure.

25                (Whereupon, a short recess was taken.)

T. HASKINS

1          E for identification as of this date by the

2          Reporter.)

3     Q.    I am handing you what we've marked as Defendants'

4     Exhibit E.  And this is your Fire Department card which

5     expires on April 9, 2017, correct?

6     A.    Correct.

7     Q.    Now, is this a card that you told me was

8     originally issued in April of 2014?

9     A.    Correct.

10    Q.    And in the card that was issued on April 2014,

11    was there anything different on the original card other

12    than the issue date?

13    A.    No.

14    Q.    So the card that was issued to you in April of

15    2014 with the exception of the issue date, is identical in

16    that respect to the card that we've marked as Defendant as

17    Exhibit E, correct?

18    A.    Correct.

19    Q.    And I am handing the original of your card back

20    to you.  Thank you, Mr. Haskins.  How many times have you

21    smoked marijuana inside Apartment 7G?

22    A.    I don't know.

23    Q.    Is it more than 10,000?

24    A.    I doubt it.  We used to sneak to smoke in there.

25    Q.    I'm sorry?

T. HASKINS

1    7G?

2       A.    I don't know.

3       Q.    Was it in 2016?

4       A.    I haven't been going to 7G much lately, nor was I

5    going much around the time when I got arrested.   I haven't

6    been going to Coney Island much since the prior event that

7    happened.

8       Q.    So is it the case then that no, the answer is no,

9    that you didn't smoke marijuana in Apartment 7G in 2016?

10      A.    No.

11      Q.    That is not the answer?

12      A.    No, I did not smoke marijuana in 7G in 2016.

13      Q.    And how about in 2015?

14      A.    No.

15      Q.    Did you smoke marijuana in 7G in 2014?

16      A.    No, I do not believe I did.

17      Q.    Did you smoke marijuana in 7G in 2014?

18      A.    No, I was on parole.   They actually were

19   advocates for me not smoking.

20      Q.    And by "they" who do you mean?

21      A.    My friends/their parents at 7G, Ms. Copeland and

22   my friends were like "no, you don't need to go to jail,

23   don't do things like that."

24      Q.    When was the most recent time sitting here today,

25   that you have smoked marijuana?

214

T. HASKINS

1     A.     Thursday.

2     Q.     So that would be Thursday, June 16, 2016?

3     A.     Correct.    Yes.

4     Q.     And what was the last time before Thursday, June

5   16, 2016?

6     A.     I don't know.

7     Q.     About how many times a week or a month would you

8   say that you smoke marijuana?

9     A.     Well, what month is this, June?

10     Q.     Yes.

11     A.     If we do averages, what's today?   By averages, it

12   would be three or four times a month.

13     Q.     How much on average do you spend on marijuana in

14   a month?

15     A.     I guess that would be like, $40.

16     Q.     In terms of quantities, not dollars, how much

17   marijuana do you buy to last you for a month?

18     A.     To last me for a month, I don't smoke all month.

19     Q.     How much marijuana do you buy at a time?

20     A.     As needed.

21     Q.     And can you give me an idea of how much in terms

22   of --

23     A.     That's four bag.

24     Q.     $40 is four bags?

25     A.     Yes.

T. HASKINS

1      A.      I don't believe so.   Maybe it could have been in

2   the hallway.   If you could see the apartment, there is

3   nowhere you could go, going out through the front, they

4   could see me.   But I don't know, I didn't see them.   But

5   you probably don't have much experience with apartments as

6   much as I do either.

7      Q.      This is about you.

8      A.      That's what I said.

9      Q.      I'd like you to look again at what we've marked

10   as Exhibit B, which is the floor plan.   And the front door

11   you had circled, correct?

12      A.      Yes.

13      Q.      There was no door in the living room between the

14   living room and the hall, correct?

15      A.      Yes.

16      Q.      So from the threshold of the living room to the

17   closet --

18      A.      You can see all the way up the hallway, all the

19   way up to this bedroom back here (indicating).

20      Q.      That's what's marked on the plan as bedroom two?

21      A.      Yes, bedroom two.

22      Q.      And from the threshold of the living room to the

23   closet where the drugs were found, according to this plan,

24   is nine feet, three inches; is that correct?

25   Approximately?

T.  HASKINS

1      A.      Say that again.

2      Q.      From the threshold of the living room to the

3  closet where the drugs were found, would it have been about

4  the width of bedroom 4?

5      A.      So about nine feet, three inches, okay.

6      Q.      Does that sound about right to you, that it

7  would've been about nine feet, three inches?

8      A.      Yes.

9      Q.      There was a woman in the apartment during your

10  arrest called either Fantasia or Shauntasia.  Can you

11  clarify the name?

12      A.      Shauntasia.

13      Q.      And who is Shauntasia?

14      A.      She is Ms. Copeland's daughter.

15      Q.      And there was nobody in the apartment called

16  Fantasia, right?

17      A.      No.

18      Q.      What age is Shauntasia now or at the time of the

19  arrest?

20      A.      I don't know.  Like 28 maybe, maybe a little

21  older, give or take.  We are all generally from the same

22  age range from like, 26, 25, and 32, and then the older

23  brother is like 35.

24      Q.      Is that Charles?

25      A.      Yes.

T. HASKINS

1    Q.    There were some references in the record last
2    time to Chuck, are Chuck and Charles the same person?
3    A.    Yes.
4    Q.    Did Ms. Copeland ever give you any reason to
5    believe that she knew that Dale Anderson had drugs in
6    Apartment 7G?
7    A.    No.
8    Q.    Did she ever give you any indication of what her
9    reaction was to the fact that Dale Anderson did have drugs
10   in Apartment 7G?
11   A.    Not directly.   I know she was crying and stuff.
12   Q.    When was she crying?
13   A.    When I had went back to see her.
14   Q.    And when was that?
15   A.    I don't know.   Maybe two days after the court
16   thing, I went and I stopped by.   She was like "are you
17   okay?"  And she just became emotional, but that was about
18   it.
19   Q.    Was that in February of 2015?
20   A.    Yes, February.
21   Q.    2015?
22   A.    Yes, whatever it was.   The last year, right.
23   Q.    Did she say anything about the fact that there
24   had been drugs found in her apartment?
25   A.    I don't recall what she said.   She had a fit.

T. HASKINS

1      A.      That is fair.

2      Q.      And it may have been earlier than that?

3      A.      It may be a little later, but that 2008 is fair.

4  That's fair.

5      Q.      Have you ever given the address 2975 West 33rd

6  Street, Apartment 4E as your address to a police officer

7  after you no longer lived in 4E?

8      A.      I don't know how to interpret that, because if

9  I've given them ID and they interpret that as my ID, that's

10  not me giving them an address.   They requested my ID, I

11  gave them what they asked for.   They may have asked me for

12  an address, I have never verbally given a false address.

13      Q.      Have there been occasions where you have handed

14  over an ID showing an address other than the one at which

15  you lived to police officers?

16      A.      I don't know.   It may or may not be.

17      Q.      Do you believe that the police were entitled to

18  arrest Dale Anderson?

19      A.      Yes.

20      Q.      And is it correct that your dispute in this case

21  is because you feel that Dale Anderson should've been

22  arrested, but that you were innocent and you should not

23  have been arrested?

24      A.      Correct and incorrect.

25      Q.      Okay.   Please, can you explain?