UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

TERREL HASKINS,

                                        Plaintiff,                    **MEMORANDUM & ORDER**
                                                                       15-CV-2016 (MKB)
                              v.

CITY OF NEW YORK, CAPTIAN THEODORE
LAUTERBORN, SERGEANT CLIFFORD
STRONG, DETECTIVE ESSENCE JACKSON,
DETECTIVE HUMBERTO KIBEL, DETECTIVE
CHRISTOPHER OTTOMANELLI and JOHN and
JANES DOES 1–10,

                                        Defendants.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Terrel Haskins commenced the above-captioned action on April 10, 2015,

against Defendants the City of New York, Captain Theodore Lauterborn, Sergeant Clifford

Strong, Detectives Essence Jackson, Humberto Kibel and Christopher Ottomanelli and John and

Jane Does 1–10, who are officers of the New York City Police Department ("NYPD").  (Compl.,

Docket Entry No. 1.)  Plaintiff filed an Amended Compliant on August 18, 2017.  (Am. Compl.,

Docket Entry No. 9.)  Plaintiff's claims arise from his arrest on February 14, 2015, for his

alleged involvement in the possession and distribution of narcotics.  (Am. Compl. ¶¶ 12–27.)

Plaintiff asserts claims for false arrest, fabrication of evidence, unlawful entry, malicious abuse

of process, failure to intervene, and municipal liability under 42 U.S.C. § 1983.  (Id. ¶¶ 28–81.)

Defendants move for summary judgment on all of Plaintiff's claims pursuant to Rule 56 of the

Federal Rules of Civil Procedure.  (Defs. Mot. for Summ. J. ("Defs. Mot."), Docket Entry No.

24; Defs. Mem. of Law in Supp. of Defs. Mot. ("Defs. Mem."), Docket Entry No. 27.)  For the

reasons discussed below, the Court denies Defendants' motion as to Plaintiff's false arrest and fabrication of evidence claims and grants the motion as to Plaintiff's unlawful entry, malicious abuse of process, failure to intervene and municipal liability claims.

## I.   Background

Plaintiff's claims arise from the execution of a search warrant for possible narcotics located in Apartment 7G at 2940 West 31st Street in Brooklyn, New York (the "Apartment"), which resulted in the discovery of narcotics in a closet and Plaintiff's arrest for his alleged involvement with the possession and distribution of the narcotics.  (Am. Compl. ¶¶ 12–81.)

### a.   The Apartment's residents and layout

In 2015, non-party Carolyn Copeland was leasing the Apartment.  (Pl. Dep. Submission A 42:4–9, 48:19–21, 134:9–14, Docket Entry No. 25-1.)[1]  Copeland resided at the Apartment with her boyfriend, Dale Anderson, her four adult children, her two adult step-children and her three minor grandchildren.  (Pl. Dep. Submission A 42:2–43:12; Pl. Dep. Submission B 54:4–55:11, 56:2–25, Docket Entry No. 33-1.)  The one-story Apartment had four bedrooms and two bathrooms, (Pl. Dep. Submission B 55:12–14), and two closets on each side of the front door entrance ("the Entryway Closets").  (Apartment 7G Floor Plan ("Floor Plan"), Docket Entry No. 25-4.)  Immediately past the Entryway Closets was the living room area.  (Floor Plan.)  Connected to the living room area and opposite the entrance, was a hallway that contained a closet and the entrances to the four bedrooms and two bathrooms.  (Floor Plan.)  Proceeding

---

[1]   The parties submitted three excerpts of Plaintiff's Deposition and each submission contains some pages that are not included in the other submissions.  (*See* Docket Entry Nos. 25-1, 33-1, 37-1.)  To clearly identify which submission of Plaintiff's Deposition the Court is referencing, the Court will refer to the excerpts submitted as Docket Entry No. 25-1 as "Plaintiff Deposition, Submission A," the excerpts submitted as Docket Entry No. 33-1 as "Plaintiff Deposition, Submission B," and the excerpts submitted as Docket Entry No. 37-1 as "Plaintiff Deposition, Submission C."

towards the hallway from the living room area, on the right side of the hallway there was a closet (the "Living Room Closet") and the two bathrooms, on the left side of the hallway there were doors to two of the bedrooms, and at the back of the hallway there were doors to the other four bedrooms.  (Floor Plan.)

### b.   Plaintiff's relationship with the Apartment and its residents

Plaintiff and Copeland's adult children were longtime friends, and Plaintiff often spent the night at Copeland's home when he lacked stable or permanent housing.  (Pl. Dep. Submission A 43:11–12, 68:3–16; Pl. Dep. Submission B 78:8–88:13.)  Because Plaintiff did not have a permanent address, Plaintiff listed the Apartment as his address on his employment identification card.  (Pl. Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 75, Docket Entry No. 32; Pl. Employment Identification Card, Docket Entry No. 25-10.)

### c.   Investigation into the criminal activity occurring at the Apartment

In January of 2015, Detectives Jackson and Kibel began investigating possible sales of narcotics occurring at 2940 West 31st Street in Brooklyn, New York.  (Investigative Reports, Docket Entry No. 25-3.)  The investigation revealed that an individual named "Dale" sold cocaine in the building and resided in Apartment 7G.  (*Id.*)  Based on the investigation, on February 10, 2015, Detective Jackson sought and obtained a search warrant to procure possible narcotics located at the Apartment and to arrest "Dale" if the search of the premises led to the discovery of narcotics.  (Search Warrant, Docket Entry No. 25-2.)

### d.   The February 14, 2015 search of the Apartment and Plaintiff's arrest

On February 14, 2015, at approximately 12:30 AM, Plaintiff contacted Copeland and asked if he could spend the night at her apartment.  (Pl. Dep. Submission A 69:12–18.)  Copeland told Plaintiff that he could.  (*Id.* at 69:19–20.)  Plaintiff arrived at the Apartment a few minutes after he spoke to Copeland.  (*Id.* at 70:16–18.)  Anderson opened the door for Plaintiff.

3

(*Id.* at 70:19–20.)  After Plaintiff entered the Apartment, Plaintiff hung his jacket on the back of

one of the Entryway Closets and sat on a couch in the living room.  (Pl. Dep. Submission B

71:4–15, 72:3–74:12.)  Anderson was in the living room on a second couch and one of

Copeland's adult children was in the living room on a third couch.  (*Id.* at 73:18–74:3.)  The

three of them watched television until they fell asleep.  (*Id.* at 74:4–10.)

Later that morning, at approximately 6:40 AM, Detectives Jackson and Kibel executed

the Search Warrant with Sergeant Strong and Captain Lauterborn serving as the supervising

officers.  (Detective Jackson Dep. 5:22–7:17, Docket Entry No. 25-5; Decl. of Captain

Lauterborn ("Captain Lauterborn Decl.") ¶¶ 1–8, Docket Entry No. 25-14; Decl. of Sergeant

Strong ("Sergeant Strong Decl.") ¶ 4, Docket Entry No. 26; Criminal Compl. 3, Docket Entry

No. 25-12.)  When the officers arrived at the Apartment, they forced the door open with a

"hydraulic tool" and entered the Apartment.  (Detective Jackson Dep. 7:14–11:5.)  Plaintiff was

asleep prior to the officers' forced entry into the Apartment, but the noise of the forced entry

woke Plaintiff.  (Pl. Dep. Submission B. 101:3–14.)  After the officers entered the Apartment,

they secured all of the individuals in the Apartment by handcuffing them and having them sit on

the couches in the living room.  (Detective Jackson Dep. 10:23–11:5.)

According to Plaintiff, after the officers placed the Apartment's occupants on the

couches, Anderson was seated next to Plaintiff and told the officers that "[w]hatever you're all

looking for, it is mine.  I got it.  I know where it is.  Nobody [else] know[s] [any]thing."

(Pl. Dep. Submission B 101:15–24, 104:14–20, 110:19–24.)  Plaintiff did not know what the

officers were searching for, nor did he know that Anderson was involved with drugs.  (*Id.* at

104:7–8, 109:13–18, 110:7–16.)  The officers then took Anderson into the hallway and he

directed them to the drugs.  (*Id.* at 108:7–14, 111:4–24.)  Plaintiff did not witness the officers

recover the drugs, but saw an officer return from the closet with a shoe box.  (*Id.* at 108:19–20, 140:16–17; Pl. Dep. Submission A 112:25–113:5; Pl. Dep. Submission C 157:13–158:3, Docket Entry No. 37-1.)  Plaintiff asserts that prior to the officers' arrival in the Apartment, the door to the Living Room Closet was closed.  (Pl. Dep. Submission C 159:14–160:24, 225:15–21.)

According to Detective Kibel, after the Apartment's occupants were handcuffed and placed on the couches, Detective Jackson took Anderson to one of the bedrooms in the Apartment and asked him if there were any drugs in the Apartment.  (Detective Kibel Dep. 11:20–12:11, Docket Entry No. 33-2.)  Anderson told Detective Jackson that there were "drugs in the [L]iving [R]oom [C]loset."  (Detective Kibel Dep. 12:12–14.)  Anderson walked with Detectives Jackson and Kibel to the Living Room Closet and directed the detectives to the location of the drugs.  (Detective Kibel Dep. 12:23–13:7, 15:18–16:11.)  Detective Jackson removed a "cardboard" box that contained drugs from the Living Room Closet.  (Detective Kibel Dep. 16:12–17:8.)  Detective Kibel did not recall Anderson making any statements taking responsibility for the drugs.  (Detective Kibel Dep. 12:18–22.)

According to Detective Jackson, after the Apartment's occupants were handcuffed and placed on the couches, Detective Jackson searched the Apartment.  (Detective Jackson Dep. 11:9–13:21.)  Detective Jackson discovered the drugs in the Living Room Closet without Anderson or anyone else directing him to the location of the drugs, and Anderson never expressed to Detective Jackson or another officer that he owned or was responsible for the drugs.  (Detective Jackson Dep. 26:4–23, 27:4–11.)  The drugs were "in plain sight" on a shelf in the Living Room Closet that was approximately five feet high.  (Detective Jackson Dep. 27:12–18, 28:11–29:4.)  The drugs were packaged in "Ziplocs" inside of a "Tupperware" container.  (Detective Jackson Dep. 29:5–25.)  When Detective Jackson was deposed on May 12, 2016, he

did not recall whether the Living Room Closet door was open prior to the search.  (Detective Jackson Dep. 1:24, 42:14–16, Docket Entry No. 33-3.)  However, in the Criminal Complaint completed on February 14, 2015, the day of the arrest, Detective Jackson stated that the Living Room Closet door was open prior to the search.  (Criminal Compl. 3.)

The officers recovered "eight (8) plastic twists of . . . cocaine," "ninety-seven (97) small [Z]iploc[] bags containing . . . marijuana," and "[t]wo clear plastic bags containing [approximately] two hundred (200) smaller [Z]iploc[] bags . . . intended for use in the packaging and dispensing of cocaine."  (Criminal Compl. 3–4; NYPD Laboratory Reports, Docket Entry No. 25-8.)  The officers placed Anderson and Plaintiff under arrest for possession with the intent to distribute narcotics.  (Pl. Dep. Submission A 113:7–23, 114:2–8; Arrest Report 1, Docket Entry No. 25-6.)  Prior to arresting Plaintiff, the officers did not ask Plaintiff for his address. (Pl. Dep. Submission A 114:12–22.)  The Arrest Report, however, listed the Apartment as Plaintiff's address.  (Arrest Report 1.)

Detective Jackson was the arresting officer.  (Arrest Report 3.)  As relevant here, Detective Jackson stated in the Criminal Complaint that:

> On February 14, 2015, at approximately 6:40 AM, [Detective Jackson] executed a search warrant at [the Apartment].  When [Detective Jackson] entered [the] Apartment [], [Detective Jackson] observed [] Anderson and Terrel[] Haskins lying on separate couches in the living room, which is the first room past the [A]partment's front door.  No other persons were in the living room. [Detective Jackson] also observed an open closet that opened onto the living room, just to the right after entering the [A]partment. [Detective Jackson] observed [] Anderson and Haskins [in] custody and control of the [recovered narcotics and packaging] . . . located in the open closet that opened onto the living room where [] Anderson and Haskins were located.

(Criminal Compl. 3–4.)

Shortly after Plaintiff was arrested, he was transported to central booking. (Pl. Dep. Submission A 112:17–21.) At Plaintiff's arraignment, the state court judge set a bail amount and Plaintiff was remanded until someone could post bail for him. (*Id.* at 112:20–23.) On February 17, 2015, three days after Plaintiff's arrest, he was released on bond after one of his family members posted his bail. (Am. Compl. ¶25.) When Plaintiff reappeared before the state court on February 19, 2015, the District Attorney's Office dismissed the charges against Plaintiff.[2] (Pl. 56.1 ¶ 58.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id*. The court's function is to decide "whether, after

---

[2] On February 19, 2017, the same day the charges against Plaintiff were dismissed, Anderson pled guilty. (Pl. 56.1 ¶ 59; Anderson Appeal Waiver, Docket Entry No. 25-13.) The record does not reflect the charges to which Anderson pled guilty or the term of any imprisonment.

resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational

juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir.

2000).

### b.   Section 1983 claims

Plaintiff asserts the following claims against Defendants under section 1983: (1) false

arrest, (2) fabrication of evidence, (3) unlawful entry, (4) malicious abuse of process, (5) failure

to intervene, and (6) municipal liability.  (Am. Compl. ¶¶ 28–81.)

Under section 1983, individuals may bring a private cause of action against persons

"acting under color of state law" to recover money damages for deprivations of their federal or

constitutional rights.  *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 55 (2d Cir. 2014) (quoting

42 U.S.C. § 1983).  To establish a viable section 1983 claim, a plaintiff must show "the violation

of a right secured by the Constitution and laws of the United States" and that "the alleged

deprivation was committed by a person acting under color of state law."  *Vega v. Hempstead

Union Free Sch. Dist.*, 801 F.3d 72, 87–88 (2d Cir. 2015) (citations and internal quotation marks

omitted).

### i.   Plaintiff abandoned the unlawful entry, malicious abuse of process, failure to intervene and municipal liability claims

Defendants move for summary judgment on all of Plaintiff's claims, including Plaintiff's

claims for unlawful entry, malicious abuse of process, failure to intervene and municipal

liability.  (Defs. Mem. 6–7, 16 n.3, 17–19, 22–25.)  In Plaintiff's opposition papers, Plaintiff

consented to dismissal of the unlawful entry and malicious abuse of process claims against

Captain Lauterborn, Sergeant Strong, Detective Kibel and Detective Ottomanelli.  (Pl. Mem. of

Law in Opp'n to Defs. Mot. ("Pl. Mem.") 2, Docket Entry No. 31.)  Accordingly, the Court

grants Defendants' motion for summary judgment as to Plaintiff's unlawful entry and malicious abuse of process claims.

The Court also dismisses Plaintiff's failure to intervene claims against Captain Lauterborn, Sergeant Strong, Detective Kibel and Detective Ottomanelli and municipal liability claim against the City of New York because Plaintiff failed to submit any arguments in response to Defendants' motion as to these claims. (*See* Pl. Mem.) Plaintiff has therefore abandoned the failure to intervene and municipal liability claims, and the Court grants Defendants' motion for summary judgment as to those claims.[3] *See Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 237 n.2 (2d Cir. 1996) ("Given [the plaintiff's] representations to the district court . . . and the failure to make pertinent arguments here, we deem the claims waived."); *Ying Li v. City of New York*, No. 15-CV-1599, 2017 WL 1208422, at *34 (E.D.N.Y. Mar. 31, 2017) ("Not only does Plaintiff fail to respond to this argument, she does not discuss this claim at all, and therefore abandons it." (citations omitted)); *Innov. Ventures, LLC v. Ultimate One Distributing Corp.*, No. 12-CV-5354, 2014 WL 1311979, at *9 (E.D.N.Y. Mar. 28, 2014) ("A plaintiff effectively

---

[3]  In any event, the Court finds that the failure to intervene and municipal liability claims fail on the merits. As to the failure to intervene claim, Plaintiff has presented no facts showing that Captain Lauterborn, Sergeant Strong, Detective Kibel and Detective Ottomanelli were present when Plaintiff was arrested and therefore "had a realistic opportunity . . . to intervene to prevent the [allegedly unlawful arrest] from occurring." *See Rogoz v. City of Hartford*, 796 F.3d 236, 251 (2d Cir. 2015); *Danielak v. City of New York*, No. 02-CV-2349, 2005 WL 2347095, at *15–16 (E.D.N.Y. Sept. 26, 2005) (dismissing a failure to intervene claim because "a police officer . . . cannot be found liable for failure to intervene unless" someone's "rights are being violated in [the officer's] presence"). As to the municipal liability claim, Plaintiff fails to present any evidence regarding any policy or custom that caused the alleged violations of his constitutional rights. *See Norton v. Town of Islip*, 678 F. App'x 17, 22 (2d Cir. 2017) (holding that a district court properly dismissed a municipal liability claim because the plaintiff "did not plausibly allege the existence of any [municipal] 'custom or policy'" that cause the alleged constitutional violations); *McCray v. County of Suffolk*, 598 F. App'x 48, 49 (2d Cir. 2015) (holding that a plaintiff's municipal liability claim failed because "[t]here is no record support to charge the [c]ounty with a policy" that caused the plaintiff's alleged harm).

concedes a defendant's arguments by his failure to respond to them."); *see also Harte v. Ocwen Fin. Corp.*, No. 13-CV-5410, 2014 WL 4677120, at \*8 (E.D.N.Y. Sept. 19, 2014) (collecting cases).  Because Plaintiff has no remaining claims against Captain Lauterborn, Sergeant Strong, Detective Kibel, Detective Ottomanelli and the City of New York, the Court dismisses these Defendants from the action.

ii. **False Arrest**

Defendants argue that the Court should dismiss Plaintiff's false arrest claim because Detective Jackson had probable cause for the arrest based on his reasonable belief that Plaintiff constructively possessed the drugs recovered from the Living Room Closet.  (Defs. Mem. 7–13.) Plaintiff argues that it was unreasonable for Detective Jackson to believe Plaintiff constructively possessed the drugs because Plaintiff was not a resident of the Apartment, Anderson admitted that he was solely responsible for the drugs, and the drugs were hidden inside a cardboard box in a closed closet.  (Pl. Mem. 4–14.)

The Fourth Amendment protects individuals from unreasonable searches and seizures by law enforcement officials.  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  A law enforcement official violates the Fourth Amendment's protections if he or she arrests someone without probable cause.  *Id.*  Conversely, "probable cause is an absolute defense to a false arrest claim."  *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010)).  "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime . . . .'"  *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852); *see also Gonzalez*, 728 F.3d at 155.  The

reviewing court "must consider [only] those facts available to the officer at the time of the arrest and immediately before it." *Stansbury*, 721 F.3d at 89 (alteration in original) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)).  The question is whether the facts known to the arresting officer, at the time of the arrest, objectively provided probable cause to support the arrest.  *Gonzalez*, 728 F.3d at 155.

### 1. Constructive possession of narcotics

In addressing a section 1983 claim for false arrest, courts look to "the law of the state in which the arrest occurred" to determine if the officers had probable cause to arrest the plaintiff for a violation of state law.  *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir 2006); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19–21 (2d Cir. 2012) (analyzing whether the plaintiff's actions gave a police officer probable cause to arrest the plaintiff for violating state law) . Defendants argue that Detective Jackson had probable cause to arrest Plaintiff for criminal possession of a controlled substance in the third degree in violation of New York Penal Law section 220.16(1) and criminal possession of marihuana in the fifth degree in violation of New York Penal Law section 221.10(2). (Defs. Mem. 7–13; Criminal Compl. 1–4.)

Under New York law, "[a] person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses [] a narcotic drug with the intent to sell it."  N.Y. Penal Law § 220.16(1).  "A person is guilty of criminal possession of marihuana in the fifth degree when he knowingly and unlawfully possesses . . . one or more preparations, compounds, mixtures or substances containing marihuana . . . ."  N.Y. Penal Law § 221.10(2).

A person may possess narcotics by "hav[ing] physical possession or otherwise [] exercis[ing] dominion or control over" the narcotics.  N.Y. Penal Law § 10.00(8).  Possession by

dominion or control, or "constructive possession," requires a "show[ing] that the defendant exercised dominion or control over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized." *People v. Manini*, 79 N.Y.2d 561, 569 (1992) (collecting cases); *see also United States v. Facen*, 812 F.3d 280, 287 (2d Cir. 2016) ("Constructive possession exists when a person has the power and intention to exercise dominion and control over an object." (citation omitted)).  A defendant's "mere presence" in a location containing narcotics is insufficient to establish constructive possession, the defendant's "presence [must be] under a particular set of circumstances" that create an inference of possession.  *People v. Bundy*, 90 N.Y.2d 918, 920 (1997); *see also Facen*, 812 F.3d at 287 ("Mere presence at the location of contraband does not establish possession." Establishing constructive possession requires showing a defendant's "presence under a particular set of circumstances from which a reasonable jury could conclude that the defendant constructively possessed contraband." (alteration and citations omitted)).  Circumstances giving rise to an inference of construction possession include: "the presence of documents pertaining to the defendant in the same location as the narcotics, the defendant's possession of a key to the location where the drugs are found," "the defendant flee[ing] the premises" upon seeing police officers, and "whether the drugs are in plain view." *Facen*, 812 F.3d at 287 (collecting cases).

Both the Second Circuit and New York State courts have found that defendants were not in constructive possession of contraband discovered by police officers where the facts failed to establish that (1) the defendants were aware of and complicit in the illegal activity, (2) the contraband was in plain view, (3) police officers knew that the defendants were residents of the apartment or home containing the contraband, or (4) the defendants exercised dominion and control over the area containing the narcotics and were not just in proximity to the location of the

narcotics.  *See United States v. Rodriguez*, 392 F.3d 539, 548–49 (2d Cir. 2004); *Jenkins v. City of New York*, No. 10-CV-4535, 2013 WL 870258, at *8–11 (E.D.N.Y. Mar. 6, 2013); *People v. Headley*, 533 N.Y.S.2d 562, 563 (App. Div. 1988) *aff'd* 74 N.Y.2d 858 (1989).

In *Rodriquez*, the Second Circuit held that a defendant was not in constructive possession of narcotics where the narcotics were located inside a telephone box in the backseat of the defendant's car.  *Rodriguez*, 392 F.3d at 548–49.  The Drug Enforcement Agency ("DEA") was investigating Carlos Medina for his possible involvement in narcotics sales.  *Id.* at 541.  An undercover DEA agent negotiated a transaction where he would purchase narcotics from Medina.  *Id.*  The transaction was to occur at a restaurant.  *Id.*  On the day of the meeting, two individuals, Luis Rodriguez and Tommy Cruz, arrived at the restaurant's parking lot in Rodriguez's car before Medina arrived.  *Id.* at 542.  Rodriguez and Cruz surveyed the surrounding area, including looking into stores and cars.  *Id.*  DEA agents on the scene in a surveillance vehicle observed Rodriguez's and Cruz's actions and believed that they may have been checking to ensure that the area was safe before Medina arrived.  *Id.*  The DEA agents therefore continued to monitor Rodriguez and Cruz.  *Id.*

Rodriguez and Cruz entered the restaurant and sat down to order food.  *Id.*  The undercover agent was already in the restaurant, seated a few tables away from Rodriguez and Cruz.  *Id.*  Medina subsequently arrived and sat at the table with the undercover agent to discuss the transaction.  *Id.*  Medina and the undercover agent agreed that the undercover agent would purchase approximately nine kilograms of heroin from Medina.  *Id.*  Medina told the undercover agent that he would retrieve the heroin and return to complete the transaction.  *Id.*  Medina left the restaurant on foot, proceeded east and made a call on his cellular telephone.  *Id.*  Minutes later, Rodriguez and Cruz left the restaurant, entered Rodriquez's car and also proceeded east.

*Id.* Soon thereafter, the surveillance agents observed Rodriguez's car drive by the restaurant with three individuals inside, but they were unable to identify the occupants. *Id.* Approximately three minutes later, Cruz and Medina returned to the restaurant in Rodriguez's car. *Id.* Rodriguez was standing alone on a street corner approximately one block away from the restaurant looking toward the restaurant parking lot. *Id.* When the undercover agent saw Medina arrive, the undercover agent left the restaurant and approached Rodriguez's car, at which point, Medina, seated in the front passenger seat, instructed the undercover agent to enter the rear of the car. *Id.* After the undercover agent entered the rear of the car, Medina instructed him to open a telephone box located behind the driver's seat. *Id.* at 542, 547. Inside the telephone box, the undercover agent observed heroin wrapped in two plastic bags. *Id.* The undercover agent informed Medina that he would go retrieve the money to complete the transaction, but instead he exited the car and signaled the surveillance agents to approach and arrest Medina and Cruz. *Id.* at 542. The agents recovered approximately 900 grams of heroin and discovered a briefcase that contained two weapons and Rodriguez's passport in the rear of the car. *Id.* Rodriguez was not apprehended that day, but the agents located and arrested him several weeks later. *Id.* at 542–43.

The government charged Rodriguez with, *inter alia*, possession with the intent to distribute heroin. *Id.* at 541. The government argued that Rodriguez constructively possessed the heroin because (1) the heroin was in a box behind the driver's seat of his car, (2) Rodriguez's briefcase containing weapons and his passport was in the rear of the car, and (3) Rodriguez was the individual seated in the rear of the car, near to the heroin, when the surveillance agents observed the car drive by the restaurant. *Id.* at 543, 546–47. A jury convicted Rodriguez on the charge of possession with the intent to distribute heroin. *Id.* at 543.

14

Rodriguez appealed the conviction and the Second Circuit reversed, holding, *inter alia*, that the government failed to establish Rodriguez's constructive possession of the heroin.  *Id.* at 548–49.  The Court held that "[m]ere presence at the location of contraband does not establish [constructive] possession."  *Id.* at 548 (citing *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 2004)).  The Court explained that "even if . . . Rodriguez was in the back seat of the car, this would only establish his proximity to a box that had heroin concealed inside of it[,] . . . [but] the government did not offer evidence to show that Rodriguez exercised dominion or control over the box containing the heroin."  *Id.* at 548–49.  The Court also rejected the government's argument that the heroin was in plain view because "the heroin was hidden inside [of] a telephone box and also wrapped in two bags."  *Id.* at 547.

Similarly, in *Jenkins*, the district court denied the defendants' motion for summary judgment in part, finding that officers lacked probable cause to arrest one of the plaintiffs for constructive possession of narcotics and a firearm located in an apartment.  *Jenkins*, 2013 WL 870258, at *8–11.  The NYPD was investigating possible narcotics sales occurring at the apartment of Betty Jenkins.  *Id.* at *4.  Betty had two children, Darryl and Shaniqua Jenkins, who also resided in the apartment.  *Id.*  An NYPD officer learned of the possible narcotics activity at the apartment based on an anonymous tip he received and his subsequent surveillance of the apartment.  *Id.*  Based on the investigation, the officer obtained a search warrant for the apartment and Darryl was the named target of the search warrant.  *Id.*  When the officer executed the search warrant, he recovered a firearm from the floor of Darryl's bedroom and ninety bags of cocaine, eighty-seven bags of marijuana and a table-top scale from an unspecified location in Darryl's bedroom.  *Id.*  According to Betty and Shaniqua, Darryl's bedroom door was locked and the officer had to force it open to search the bedroom.  *Id.* at *9.  After recovering the firearm

15

and narcotics, the officer arrested Betty, Darryl and Shaniqua. *Id.* at *5. Darryl pled guilty to possessing the narcotics and the firearm and the charges against Betty and Shaniqua were dismissed. *Id.*

Betty and Shaniqua subsequently commenced an action against the City of New York and the officer, alleging that the officer arrested them without probable cause. *Id.* at *1. The defendants moved for summary judgment, arguing that the officer had probable cause to arrest Betty and Shaniqua for constructively possessing the narcotics and the firearm. *Id.* at *5. The court noted that under New York law, "[t]he doctrine of constructive possession allows the police to find probable cause to arrest anyone in a dwelling when contraband is discovered in plain view and [it] reasonably appears that all members of the dwelling exercised dominion and control over the area in which the contraband is found." *Id.* at *9 (internal quotation marks omitted) (quoting *Takacs v. City of New York*, No. 09-CV-481, 2011 WL 8771384, at *3 (S.D.N.Y. Jan. 24, 2011)). As to Betty, the court found that the officer had probable cause to arrest her because "she resided in the apartment, [the officer] had done a computer check . . . to confirm the residents of the apartment prior to obtaining the warrant," and "the officers had been informed of numerous drug sales at the [] apartment," which made it reasonable for the officers to assume that she was aware of and involved in the narcotics activity occurring at the apartment. *Id.* at *7–8. As to Shaniqua, the court found that the officers lacked probable cause to arrest her for constructively possessing the narcotics or the firearm. *Id.* at *8–11. The court noted that "the drugs and the gun were all found in a room belonging to Darryl Jenkins," which "was locked and [] the lock needed to be broken before the police could enter." *Id.* at *9. The court also highlighted that the record lacked any evidence establishing that Shaniqua had a key to Darryl's bedroom. *Id.* at *10. In addition, the Court highlighted that there was no evidence in the record

as to whether Shaniqua was present in the apartment during the time when the officer observed narcotics sales occurring at the apartment.  *Id.* at *8.  Therefore, the court found that the officer lacked probable cause to arrest Shaniqua because, even though she was a resident of the apartment, the officers had no knowledge that she was present during or aware of any narcotics sales at the apartment and there was no evidence that she had access to Darryl's bedroom.  *Id.* at *8, *11.

Finally, in *Headley*, the New York Supreme Court, Appellate Division, Second Department (the "Appellate Division"), held that the defendants' presence in an apartment was alone insufficient to establish constructive possession of significant amounts of narcotics, firearms and ammunition discovered by police officers pursuant to a valid search warrant.  *Headley*, 533 N.Y.S.2d at 563.  The officers had a search warrant for an apartment located in Queens, New York.  *Id.* at 564.  When the officers arrived at the apartment, they knocked on the door, announced themselves as police officers and requested that the occupants open the door.  *Id.*  The occupants did not open the door and the officers forced entry into the apartment.  *Id.*  After entering the apartment, the officers observed five individuals in the living room.  *Id.*  The officers proceeded to search the apartment and in a bedroom closet, the door to which was partially open, found a tote bag containing large quantities of cocaine and marijuana as well as three handguns and matching ammunition.  *Id.* at 564–65.  In a metal box on a table in the living room, the officers discovered cocaine, a handgun and cash.  *Id.* at 563, 565.  The officers arrested all the occupants, three of whom were tried and convicted for possession of the narcotics and the firearms.  *Id.* at 563.  The trial court set aside the verdict as to those three individuals based on the state's failure to produce evidence establishing that they constructively possessed the narcotics or the firearms.  *Id.*  The Appellate Division affirmed the dismissal.  *Id.*  The Appellate

Division held that because the narcotics and the firearms "were not in open view," the state was required to establish dominion and control over the narcotics and the firearms through other evidence. *Id.* The Appellate Division noted that the record lacked any evidence showing that the individuals "had any connection with the apartment, except their presence in the living room on the day in question," and that "the weapons, drugs and money found in the living room were totally concealed in a metal box on an end table." *Id.* Accordingly, the Appellate Division held that the individuals were not in constructive possession of the narcotics or the firearms. *Id.* In a one-page opinion, the New York Court of Appeals affirmed the Appellate Division's decision, holding that there was "no evidence of [the] defendants' dominion and control over the contraband. Proof that the premises were used for drug dealing was not sufficient to establish . . . [constructive] possession." *People v. Headley*, 74 N.Y.2d 858, 859 (1989).

### 2. Disputed issues of fact exist as to Plaintiff's constructive possession of the narcotics

Based on the evidence before the Court, genuine disputes as to issues of material fact exist as to whether Detective Jackson had probable cause to arrest Plaintiff for constructive possession of the recovered narcotics.

Detective Jackson procured a search warrant for the Apartment and Anderson was a target of the Search Warrant based on Detective's Jackson knowledge that Anderson had sold narcotics outside of the Apartment. (Investigative Reports; Search Warrant.) Plaintiff was not a target of the Search Warrant (*see* Search Warrant), nor is there any evidence in the record that prior to the execution of the Search Warrant, Detective Jackson or any other officer observed Plaintiff engage in the narcotics sales inside or outside the Apartment. In addition, there is no evidence in the record that prior to the execution of the Search Warrant, Detective Jackson or any other officer ran a database search to determine the residents of the Apartment.

When Detective Jackson executed the Search Warrant, upon entering the Apartment, he observed Plaintiff and Anderson lying on separate couches in the living room. (Criminal Compl. 3; Pl. Dep. Submission B 101:3–14.) The officers proceeded to secure all the individuals in the Apartment by handcuffing them and having them sit on the couches in the living room. (Detective Jackson Dep. 10:23–11:5.) According to Plaintiff, Anderson then told the officers that any contraband or narcotics that the officers discovered belonged only to Anderson. (Pl. Dep. Submission B 101:15–24.) Anderson directed the officers to the location of the narcotics, which were in a cardboard box in the Living Room Closet. (*Id.* at 108:7–14; Detective Kibel Dep. 16:12–17:8; Pl. 56.1 ¶ 35.) While Plaintiff did not observe the officers recover the narcotics from the Living Room Closet, Plaintiff asserts that the Living Room Closet door was closed and that he heard the officers open the door before recovering the narcotics. (Pl. Dep. Submission C 159:14–160:24, 225:15–21.) Based on the discovery of the narcotics in the Living Room Closet, Plaintiff's location in the living room when the officers entered the Apartment, and the fact that Plaintiff was asleep in the living room, Detective Jackson arrested Plaintiff for constructively possessing the recovered narcotics. (Criminal Compl. 3–4.) Prior to arresting Plaintiff, neither Detective Jackson nor any other officer asked Plaintiff for his address. (Pl. Dep. Submission A 114:12–22.)

The record fails to establish (1) that Detective Jackson knew whether Plaintiff resided at the Apartment prior to arresting him, (2) that Plaintiff was present during or aware of the narcotics activity that occurred inside or outside the Apartment, (3) that the narcotics were in plain view, or (4) that Plaintiff exercised dominion and control over the Living Room Closet and was not just in proximity to the location of the narcotics. The Court addresses each factor below.

### A. Defendants fail to establish that Detective Jackson knew that Plaintiff resided at the Apartment prior to the arrest

There is no evidence that Detective Jackson knew that Plaintiff resided at the Apartment prior to arresting him. An officer has probable cause to arrest a person when the officer finds contraband in the person's home, as the person may be presumed to constructively possess items within his or her home. *See Jenkins*, 2013 WL 870258 at *8 (finding that the officers had probable cause to arrest the lessee of the apartment given that she leased and resided in the apartment and it was therefore reasonable for the officers to assume that she was aware of and involved in the narcotics activity); *Davis v. City of New York*, No. 04-CV-3299, 2007 WL 755190, at *5 (E.D.N.Y. Feb. 15, 2007) ("[A]s residents of the household and occupants of the bedroom in which the contraband was found, there would have been sufficient probable cause to arrest them for constructive possession of the marijuana . . . that was seized in their bedroom by the officers").

Here, there is no evidence that, prior to executing the Search Warrant, Detective Jackson had any information establishing that Plaintiff resided at the Apartment, which would have allowed the officers to presume Plaintiff's constructive possession of the narcotics in the Living Room Closet. *See Headley*, 533 N.Y.S.2d at 563–64 (holding that the defendants were not in constructive possession of narcotics because there was "no proof that the [defendants] had any connection with the apartment, except their presence in the living room on the day in question" and "[n]one of the defendants was the tenant of record").

### B. Defendants fail to establish that Plaintiff was involved with or complicit in the narcotics activity

Nor is there any evidence that Plaintiff was involved with or complicit in any narcotics activity inside or outside of the Apartment. An officer has probable cause to arrest a person for constructively possessing narcotics when the officer has information that reasonably leads the

20

officer to believe that the person observed illegal narcotics activity and therefore likely was involved in the illegal activity. *See United States v. Heath*, 455 F.3d 52, 57 (2d Cir. 2006) (holding that officers had probable cause to arrest a defendant for constructively possessing narcotics where he was permitted to observe the narcotics activity because "those who are permitted to observe obvious criminal activity in a home are, absent indications to the contrary, likely to be complicit in the offense" (collecting cases)).

There is no evidence in the record that Detective Jackson knew that Plaintiff observed or was involved in any narcotics activity. In fact, Detective Jackson obtained a Search Warrant for the Apartment based on information that Anderson sold narcotics outside of the Apartment and resided in the Apartment, but none of the sales that Detective Jackson was aware of were conducted in Plaintiff's presence. (*See* Investigate Reports.) Due to the absence of any evidence that Detective Jackson knew that Plaintiff observed or was involved in any narcotics activity, Detective Jackson lacked probable cause to arrest Plaintiff for constructive possession of the narcotics on that basis. *See Jenkins*, 2013 WL 870258 at *9 (finding that genuine disputes as to issues of material fact existed as to whether the officers had probable cause to arrest the plaintiff for constructively possessing narcotics because she was "absent from the [] apartment for periods in the daytime, when all of the drugs sales known to the police officers occurred").

### C. Disputed issues of fact exist as to whether the narcotics were in plain view

Moreover, the record does not establish that the narcotics were in plain view. An officer has probable cause to arrest a person for constructively possessing narcotics when the officers find the person in a room or home containing narcotics that are in "plain view." *United States v. Paulino*, 445 F.3d 211, 216, 222 (2d Cir. 2006) (holding that a defendant constructively possessed narcotics because the narcotics were in plain view on top of a dresser); *People v.*

*Mayo*, 13 N.Y.3d 767, 768 (2009) (holding that a defendant constructively possessed narcotics because the narcotics were in plain view on the floor of the room the officers found the defendant in when they executed a search warrant).

Genuine disputes exist here as to whether the narcotics were in plain view.  According to Detective Jackson, the narcotics were in a Tupperware container inside the Living Room Closet, the door to which was open when the officers entered the Apartment.  (Detective Jackson Dep. 27:12–29:25; Criminal Comp. 3.)  According to Plaintiff, the narcotics were in a cardboard box in the Living Room Closet and the door to the Living Room Closet was closed before the officers arrived and searched the Apartment.  (Pl. Dep. Submission C 159:14–160:24, 225:15–21.)  Because Defendants are the moving party, the Court must draw all inferences in favor of Plaintiff.  Drawing all inferences in Plaintiff's favor, the narcotics were hidden in a cardboard box inside a closed closet.  These facts therefore create disputed issues regarding whether the narcotics were in plain view and whether Detective Jackson had probable cause to arrest Plaintiff for constructive possession of the narcotics.  *See Headley*, 533 N.Y.S.2d at 563 (holding that the defendants were not in constructive possession of contraband where the defendants were present in a living room and there was a metal box that contained contraband located on a table in that same room); *see also Rodriguez*, 392 F.3d at 548–49 (holding that the defendant did not constructively possess narcotics that were inside a telephone box behind the driver's seat of his car, even assuming he had sat in the rear of the car near the box).

### D.  Defendants fail to establish that Plaintiff exercised dominion and control over the narcotics or the area containing the narcotics

Defendants also lack any evidence establishing that Plaintiff exercised dominion and control over the narcotics.  As noted above, constructive possession of narcotics requires a person to exercise dominion and control over the narcotics or the area in which in the narcotics

are located and mere presence in the location of or proximity to the narcotics is insufficient to establish dominion and control. *See Bundy*, 90 N.Y.2d at 920; *see also Facen*, 812 F.3d at 287.

Defendants focus much of their argument regarding Plaintiff's alleged constructive possession of the narcotics on the fact that when the officers entered the Apartment, Plaintiff was asleep on the couch near the Living Room Closet. (*See* Defs. Mem. 11–13.)  In support of their argument, Defendants rely on *Caraballo v. City of New York*, No. 10-CV-1885, 2012 WL 12883307, at *2 (E.D.N.Y. June 21, 2013).  (Defs. Mem. 11, 13.)  In *Caraballo*, the court dismissed the plaintiff's false arrest claim because, in executing a search warrant, the officers discovered contraband in an apartment and it was reasonable for the officers "to believe that persons sleeping in the apartment were residents of the apartment and therefore in constructive possession of the contraband found therein." *Caraballo*, 2013 WL 12883307 at *2.  Although *Caraballo* appears to support Defendants' argument, on appeal, the Second Circuit clarified the reason why the officers had probable cause to arrest the plaintiffs for constructively possessing the contraband.  *See Caraballo v. City of New York*, 526 F. App'x 129, 131 (2d Cir. 2013).  In affirming the district court's decision, the Second Circuit held that the officers had probable cause to arrest the plaintiffs because the "officers found loose, unmarked pills of various shapes in paper bags and unmarked pill containers in the kitchen" and "the undisputed facts establish[ed] that plaintiffs were sleeping in a small apartment in which police found drugs on more than one occasion, including at the time of the arrest, . . . in a common area of that apartment."  *Id.* at 131.  The Court's holding was not based on the fact that the plaintiffs were asleep in an apartment containing narcotics, but on the fact that the plaintiffs were asleep in an apartment containing narcotics "in plain sight."  *See id.*

Because as discussed above, there are genuine disputes as to whether the narcotics were in plain sight, *Caraballo* is distinguishable from the facts of this case.  Furthermore, to find that police officers have probable cause to arrest someone simply because they are asleep in a location containing narcotics that are not in plain view contravenes the well-established rule that "[m]ere presence at the location of contraband does not establish [constructive] possession." *Rodriguez*, 392 F.3d at 548; *see also Facen*, 812 F.3d at 287; *Bundy*, 90 N.Y.2d at 920; *Headley*, 533 N.Y.S.2d at 563.

Accordingly, because the Court finds that there are genuine disputes as to issues of material fact pertaining to whether Detective Jackson had probable cause to arrest Plaintiff for constructive possession of the narcotics recovered from the Living Room Closet, the Court denies Defendants motion for summary judgment as to Plaintiff's false arrest claim against Detective Jackson.

### iii.  Fabrication of evidence

Defendants argue that the Court should dismiss Plaintiff's fabrication of evidence claim because Detective Jackson provided accurate information to the District Attorney's Office about the events surrounding Plaintiff's arrest.  (Defs. Mem. 19–21.)  Plaintiff argues that Detective Jackson provided inaccurate information when Detective Jackson informed the District Attorney's Office that because the narcotics were recovered from a plastic container in the Living Room Closet, the door to which was open, Plaintiff constructively possessed the narcotics.  (Pl. Mem. 16–17.)

To establish a fair trial claim based on a fabrication of evidence, a plaintiff must show that "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation

24

of liberty as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016) (citation omitted); *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)).  Unlike a false arrest or malicious prosecution claim, "probable cause is not a defense to a claim for a denial of the right to a fair trial" based on the fabrication of evidence.  *Garnett*, 838 F.3d at 277 (alteration omitted) (citing *Jovanovic*, 486 F. App'x at 152).

An investigating official may be any governmental actor that investigates alleged criminal activity, which in most cases is a police officer.  *See Garnett*, 838 F.3d at 274 ("[A] Section 1983 plaintiff may sue for denial of the right to a fair trial based on a police officer's fabrication of information."); *Ricciuti*, 124 F.3d at 130 ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such [] action is redressable in an action for damages under [section] 1983." (citation omitted)).  A plaintiff need only produce some evidence showing that the officer's statement or evidence is false or manipulated.  *See Garnett*, 838 F.3d at 269–70, 279 (holding that the plaintiff's and the officer's conflicting accounts of the events underlying the charges created an issue of fact as to falsity); *Morse v. Fausto*, 804 F.3d 538, 547 (2d Cir. 2015) (holding that the plaintiff's documents showing that the prosecutor omitted material portions of relevant evidence created an issue of fact on falsity); *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003) (holding that the plaintiff's testimony that the information was false was sufficient evidence to create an issue of fact as to falsity).  Whether the fabricated evidence is likely to influence a jury's decision can be satisfied by showing that the fabricated evidence was material to the prosecutor's case.  *See Garnett*, 838 F.3d at 277 (holding that fabricated evidence is material when it may affect "the

prosecutor's decision to pursue charges rather than to dismiss the complaint without further action" or could influence "the prosecutor's . . . assessments of the strength of the case").  Proof that a police officer forwarded the fabricated evidence to a prosecutor can be satisfied by direct evidence that the officer gave the evidence to the prosecutor or by other evidence from which it can be inferred that the officer forwarded the fabricated evidence to a prosecutor.  *See Morse*, 804 F.3d at 547 (holding that it was clear that the fabricated evidence was forwarded to a prosecutor because the prosecutor used the fabricated evidence during a grand jury proceeding); *Higazy v. Templeton*, 505 F.3d 161, 177–78 (2d Cir. 2007) (holding that there was an issue of fact as to whether a police officer forwarded false information to a prosecutor because it appeared that the prosecutor relied on the false information at the plaintiff's bail hearing).  A Plaintiff can establish a depravation of liberty through the number of court appearances a plaintiff made post-arraignment, constraints such as bail requirements, a period of incarceration or travel restrictions.  *See Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995); *Arbuckle v. City of New York*, No. 14-CV-10248, 2016 WL 5793741, at *10–11 (S.D.N.Y. Sept. 30, 2016) (collecting cases).  However, "there can be no question" that a plaintiff suffered a deprivation of liberty when he was "physically detained following arraignment."  *Murphy v. Lynn*, 118 F.3d 938, 945 (2d Cir. 1997).

Here, Defendants argue that Detective Jackson did not provide any material false information to the District Attorney's office.  (*See* Defs. Mem. 20 ("Plaintiff's denial of fair trial claim fails . . . because there is simply no evidence that any material information [Detective Jackson] transmitted to the District Attorney's Office was false.); Pl. 56.1 ¶ 57 ("The Criminal Court Complaint . . . sworn to by Detective Jackson is the only evidence . . . of any of the Defendants communicating facts about Plaintiff's arrest to the District Attorney's Office.").)

Because there are disputed issues of fact regarding the circumstances of Plaintiff's arrest, Defendants are not entitled to summary judgment on Plaintiff's fabrication of evidence claim.  In the Criminal Complaint, Detective Jackson stated:

> On February 14, 2015, at approximately 6:40 AM, [Detective Jackson] executed a search warrant at [the Apartment].  When [Detective Jackson] entered [the] Apartment [], [Detective Jackson] observed [] Anderson and Terrel[] Haskins lying on separate couches in the living room, which is the first room past the [A]partment's front door.  No other persons were in the living room. [Detective Jackson] also observed an open closet that opened onto the living room, just to the right after entering the [A]partment. [Detective Jackson] observed [] Anderson and Haskins [in] custody and control of the [recovered narcotics and packaging] . . . located in the open closet that opened onto the living room where [] Anderson and Haskins were located.

(Criminal Compl. 3–4.)  At Plaintiff's arraignment, the state court judge set a bail amount and Plaintiff was remanded until one of his family members posted his bail.  (Pl. Dep. Submission A at 112:20–23.)  On February 17, 2015, three days after Plaintiff's arrest, he was released on bond.  When Plaintiff reappeared before the state court on February 19, 2015, the District Attorney's Office dismissed the charges against Plaintiff.  (Pl. 56.1 ¶ 58.)

As discussed above in the Court's analysis of Plaintiff's false arrest claim, the parties dispute whether the narcotics were in a Tupperware container or a cardboard box and whether the door to the Living Room Closet was open before the officers arrived.  Likewise, genuine disputes as to issues of material fact exist as to whether Detective Jackson provided false information — namely, that the narcotics were in a Tupperware container and that the door to the Living Room Closet was open.  *See Garnett*, 838 F.3d at 269–70, 279 (holding that the plaintiff's and the officer's conflicting accounts of the events underlying the charges created an issue of fact as to falsity); *Jocks*, 316 F.3d at 138 (holding that the plaintiff's testimony that the information was false was sufficient evidence to create an issue of fact as to falsity).  As also

discussed in the Court's false-arrest analysis, disputed issues of fact exist as to whether Detective Jackson had probable cause to arrest Plaintiff for constructively possessing the narcotics if, *inter alia*, the narcotics were in a cardboard box in the Living Room Closet and the door to the Living Room Closet was closed.  Thus, the drugs would not have been in plain view and Plaintiff could not be found to be in constructive possession of narcotics that are not in plain view based only on his presence near or proximity to the narcotics.  For the same reasons, the Court finds that the allegedly false information provided by Detective Jackson was material to the decision by the District Attorney's Office to charge Plaintiff with constructive possession of the narcotics.  *See Garnett*, 838 F.3d at 277 (holding that fabricated evidence is material when it may affect "the prosecutor's decision to pursue charges rather than to dismiss the complaint without further action" or could influence "the prosecutor's . . . assessments of the strength of the case").  Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiff's fabrication of evidence claim against Detective Jackson.

### iv.  Qualified Immunity

Defendants argue, in the alternative, that the Court should dismiss Plaintiff's false arrest claim because Detective Jackson had arguable probable cause to arrest Plaintiff and is therefore entitled to qualified immunity.  (Defs. Mem. 13–16.)  Except for arguing that Detective Jackson had a reasonable, even if mistaken, belief that there was probable cause to arrest Plaintiff, Defendants qualified immunity arguments essentially mirror their arguments as to the merits of the false arrest claim — that Detective Jackson's observations permitted him to believe that Plaintiff constructively possessed the narcotics.  (*Compare* Defs. Mem. 7–13 *with* Defs. Mem. 13–16.)  Plaintiff argues that Detective Jackson is not entitled to qualified immunity because,

similar to the merits of the false arrest claim, genuine disputes as to issues of material facts exist regarding whether Detective Jackson had arguable probable cause.  (Pl. Mem. 14–16.)

Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied:  (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law."  *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2014).  As to whether the right is clearly established, the "dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* at 92 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established."  *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004).  "[T]he relevant question is whether a reasonable officer could have believed [his or her conduct] to be lawful, in light of clearly established law and the information [he or she] possessed."  *Id.* at 115 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).  Defendants bear the burden of proof to establish that qualified immunity exists.  *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012); *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011).  In determining whether an officer is entitled to qualified immunity, the facts must be "taken in the light most favorable to the party asserting the injury."  *Loria v. Gorman*, 306 F.3d 1271, 1281 (2d Cir. 2002).

Because "[i]t is firmly established that . . . claims of arrest . . . without probable cause implicate constitutional rights, [] the dispositive issue for purposes of . . . qualified immunity is whether based on the facts as alleged by [the plaintiff], [the officer's] actions were based on probable cause."  *Loria*, 306 F.3d at 1281 (citing *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).

"In the context of a false arrest claim, qualified immunity protects an officer if he had arguable probable cause to arrest the plaintiff." *Myers v. Patterson*, 819 F.3d 625, 632–33 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Garcia*, 779 F.3d at 92). "Arguable probable cause exists if [] it was objectively reasonable for the officer to believe that probable cause existed or [] officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* at 633 (internal quotation marks omitted) (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). "[A]n officer lacks arguable probable cause and is not entitled to qualified immunity only where no officer of reasonable competence could have made the same choice in similar circumstances." *Id.* (internal quotation marks omitted) (quoting *Lennon v. Miller*, 66 F.3d 416, 420–21 (2d Cir. 1995)).

As discussed above, there are genuine disputes as to issues of material fact regarding whether a reasonable officer would believe that there was probable cause to arrest Plaintiff for constructive possession of the narcotics. For the same reasons as set forth above, the Court finds that there are disputed issues of material fact as to arguable probable cause — namely, whether an officer of reasonable competence would believe there was probable cause to arrest Plaintiff for constructively possessing the narcotics.[4] *See Jenkins v. City of New York*, 478 F.3d 76, 87–

---

[4] In support of Defendants' qualified immunity argument, Defendants rely on *Cole v. City of New York*, No. 10-CV-5308, 2013 WL 781640, at *5–8 (S.D.N.Y. Mar. 1, 2013), and *Brown v. City of New York*, No. 11-CV-1068, 2013 WL 491926, at *8–9 (S.D.N.Y. Feb. 8, 2013). In *Cole*, the court found that the plaintiff's arrest was supported by probable cause because, unlike here, there was no dispute that the officers found narcotics in plain view. *See Cole*, 2013 WL 491926, at *5 (The "[d]efendants found . . . two twists [of cocaine] on bed and bedside table in the basement [where the arrest occurred], along with drug paraphernalia. . . . Under the doctrine of constructive possession, officers have probable cause to arrest anyone in a dwelling when contraband is discovered in plain view and it reasonably appears that all members of the dwelling exercised dominion and control over the area in which the contraband is found." (internal quotation marks omitted) (quoting *Takacs v. City of New York*, No. 09-CV-481, 2011 WL 8771384, at *3 (S.D.N.Y. Jan. 24, 2011))). In *Brown*, the court found that the officers had

88 (2d Cir. 2007) (holding that the police officers were not entitled to qualified immunity on a false arrest claim where the parties disputed the essential facts underlying the probable cause analysis because "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause").  Accordingly, Detective Jackson is not entitled to qualified immunity as to the false arrest claim.

### III. Conclusion

For the foregoing reasons, the Court denies Defendants' motion as to Plaintiff's false arrest and fabrication of evidence claims and grants the motion as to Plaintiff's unlawful entry, malicious abuse of process, failure to intervene and municipal liability claims.  Because Plaintiff has no remaining claims against Captain Lauterborn, Sergeant Strong, Detective Kibel, Detective Ottomanelli and the City of New York, the Court dismisses them from the action.  The Clerk of Court is directed to amend the docket accordingly.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  August 24, 2017
        Brooklyn, New York

---

arguable probable for the plaintiffs' arrest because even though the plaintiffs were overnight guests, when the officers executed the search warrant, the plaintiffs were naked and asleep in a bed in a bedroom from which the officers recovered narcotics.  *Brown*, 2013 WL 491926, at *8–9.  The court did not specify where in the bedroom the narcotics were located.  *Id.* at *1–2, *8–9.  Here, unlike *Brown*, Plaintiff was fully clothed and asleep in the living room and there is a dispute as to whether the narcotics were in plain sight.  Accordingly, the Court finds *Cole* and *Brown* distinguishable.